RAYTON E. HORTON, trustee in bankruptcy of Joseph Bamford, Jr.,

*v.*

WALTER BAMFORD et ux. et al.

[Decided November 10th, 1911.]

1. Evidence in an action by a trustee in bankruptcy to avoid a sale of property previously owned by a voluntary bankrupt *held* sufficient to show that a brother of the bankrupt, associated with him in business and who, in the six months preceding the bankruptcy, purchased property of the bankrupt on an execution sale, and, on a sale of collateral by his creditors, knew the bankrupt's financial condition, and that any of his property sold for less than its full value, to the extent of such deficiency, was being withdrawn from his creditors, and either by express or tacit understanding with the bankrupt undertook to pay creditors holding collateral their full amounts, and secure to himself whatever equity there was above the amount due to the secured creditors.

2. A brother of a voluntary bankrupt who during the six months preceding the bankruptcy proceeding, by express tacit understanding, set out to pay the creditors who held collateral their full amounts and secure to himself whatever equity there was in such collateral above the amounts due the secured creditors, but to whom the bankrupt himself owed no money, and whose rights with respect to the bankrupt and his property were in aid of securing himself because he was an endorser upon a secured note of the bankrupt, was not a "creditor."

3. A trustee in bankruptcy is a proper person to bring a suit against the purchaser at an execution sale, and, at a sale of collateral previously owned by the bankrupt, to avoid such transfers declared void, since the debts represented by him are so fastened to the property of the debtor that conveyances which would be held void or voidable at the instance of lien creditors are properly held voidable at the instance of the trustee.

4. To sustain a holding that transactions between a bankrupt and one who has purchased his property from his creditors upon a sale of collateral made with his consent were actually fraudulent, it must be found that there was a covinous agreement between the bankrupt and such purchaser to transfer the bankrupt's property with the intent to defraud creditors, and it is not sufficient to a determination of actual fraud to find that the debtor alone transferred his property with the intent to defraud.

5. In the pursuit of fraud against creditors or in investigating with respect to it, the substance of the transaction is viewed, and not its form, and it is immaterial whether such fraud was perpetrated by means of judicial or other public sale, or whether it was by private agreement and transfer.

6. Circumstances such as would put a reasonable person upon inquiry with respect to the financial condition of a transferrer will charge creditors or others dealing with a failing debtor with such facts as they would have learned had they properly investigated.

7. Transfers by a debtor while suits are pending against him are always suspicious circumstances such as would lead a reasonable man to investigate concerning the financial condition of his transferrer.

8. While a settlement upon one dependent upon the settler may not be considered as a badge of fraud, the dealings between near relatives, one of whom is largely indebted and the other of whom obtains his property, are viewed with suspicion.

9. Where one, either a creditor or a purchaser, takes property from a debtor whom he knows to be indebted or under circumstances that put him on inquiry as to the financial condition of his transferrer, he must, even in the absence of proof of a participation with the debtor in an intention to defraud creditors, either pay approximately the value of the property taken, or take the risk of being held responsible for any inadequacy, if it is of such an amount as to show that the transfer was not a fair and proper one under the circumstances, upon the theory that with respect to all of the property transferred in excess of consideration the conveyance is voluntary, and therefore fraudulent.

10. As to a voluntary conveyance made by one who is indebted, there is an irrebuttable presumption of fraud.

11. *2 Gen. Stat. p. 1604 § 12*, which provides that every conveyance of lands or goods, and every judgment and execution contrived in fraud or collusion with intent to defraud creditors and others shall be void, applies only where there is an actual participation in the fraud by the grantee or transferee.

12. Jurisdiction concerning fraudulent conveyances is exercised by courts of equity in this state upon the theory of inherent equitable powers, irrespective of any statute.

13. In the absence of satisfactory proof of actual fraud, a transfer by a debtor will be sustained to the extent of the consideration actually given, and declared void as to the residue, the amplified principle being that where a court of equity is asked to set aside a deed as voluntary and fraudulent as against creditors, and the evidence is not sufficient to induce the court to avoid the deed absolutely, but merely excites a well-grounded suspicion as to the adequacy of the consideration and the fairness of the transaction, the court will permit the conveyance to stand as security for the consideration actually given. ·

14. Where the consideration paid by a purchaser on a transfer of property by a debtor went to satisfy legitimate debts of the debtor, the purchaser will be protected to that extent.

15. In an action by a bankrupt's trustee to avoid purchases at execution sale against a bankrupt, and also at a sale of collateral securing the bankrupt's notes, where the purchaser had knowledge of the bankrupt's financial condition, or where the circumstances were such as to put him upon inquiry respecting it, the purchaser has the burden of proving, in view of the purchase of two thousand shares of stock owned by the bankrupt of the par value of $200,000 for a consideration of $5,000, what the actual value of the stock was, so that the court could determine whether his conduct was fair and equitable, and whether his holding of it was fraudulent as to the excess of the value of the stock over the price paid.

16. In a suit by a bankrupt's trustee against a purchaser of stock formerly owned by the bankrupt at a sale of collateral, consented to by the bankrupt, evidence by the purchaser *held* insufficient to show that the consideration was adequate to sustain the transaction.

17. Where the proof in a suit by a bankrupt's trustee against a purchaser of stock formerly owned by the bankrupt to have the transfer declared void as in fraud of creditors is not sufficient to require the transfer to be held absolutely void, and it is held void only to the extent of any excess over the consideration actually paid and its value, the court, on rendering judgment for the complainant, will require him to give bond to secure the purchaser for the amount that is found to be due him on the transaction.

---

Heard on bill, answers, replications and proofs in open court.

This is a bill filed by the trustee in bankruptcy of Joseph Bamford, Jr., against the said Joseph Bamford, Jr., his brother, Walter Bamford, and the wife of the latter. (The wife is made a defendant solely because of a claim of inchoate right of dower in certain of the property which formerly belonged to Joseph, and which was purchased by Walter.) The purpose of the bill is to obtain a decree declaring null and void, as against the creditors of Joseph Bamford, Jr., represented by the trustee in bankruptcy, the sale of certain property, both real and personal, previously

owned by Joseph Bamford, Jr., and purchased by Walter Bamford.

The charge of the bill is that these transfers were effected in fraud, to hinder, delay and defraud the creditors of Joseph Bamford, Jr., and that some of them were within four months of the filing of the petition in bankruptcy, and therefore preferences forbidden by the Bankruptcy law.

The defendants Walter and Joseph Bamford, Jr., have each filed answers denying that the purchases made by Walter Bamford of Joseph Bamford, Jr.'s property were fraudulent, or were to hinder, delay and defraud the creditors of Joseph; and affirming and asserting the validity and legality of each of said purchases.

*Mr. Clifford L. Newman,* with whom was *Mr. Alexander Simpson, Mr. Francis C. Lowthorp* and *Mr. Everly M. Davis* and *Mr. Alexander Thain* (of the New York bar), for the complainants.

*Mr. Harry V. Osborne* and *Mr. William B. Gourley,* for the defendant Walter Bamford.

*Mr. Wayne Dumont,* for the defendant Joseph Bamford, Jr.

GARRISON, V. C.

I find the facts as follows: About 1891, Joseph Bamford, his eldest son Joseph, Jr., and his youngest son Walter incorporated the Bamford Brothers Silk Manufacturing Company. Its plant was at Paterson, New Jersey. Eventually, this company issued six thousand shares of capital stock of the par value of $100 each, and of these each of the parties above named had two thousand shares. The elder son Joseph, the defendant herein, was the superintendent or manager, and also the secretary of this company; Walter was the treasurer, and, at first, the father was the president and subsequently Walter. The father died in April of 1909. About 1906, Joseph Bamford, Jr., became connected with a corporation named Baxter & Company, which was engaged in railroad construction, and had its headquarters in New York City; and in 1907, by reason of his connection with this business, he

was very largely indebted. There were at least $80,000 of notes of his which were unsecured, and there were between thirty-eight and forty thousand dollars more of notes for which he had given security. In the summer of 1907, he was in dire financial difficulties, and, as Walter phrased it in his testimony in the bankruptcy proceedings, it was "public property" that Joseph was in poor condition; that he had been losing money through what Walter termed "robbers," and had financially ruined himself.

At this time, in addition to the $200,000 par value of stock which Joseph owned in the Bamford Brothers Silk Manufacturing Company, he is shown to have been the owner of the following:

Twenty-six shares of the capital stock of the Hamilton Trust Company of Paterson, New Jersey, of the par value of $100 each.

Thirty shares of the capital stock of the Silk City Safe Deposit and Trust Company of Paterson, New Jersey, of the par value of $100 each.

One hundred and forty-two shares of the common stock of the United Shoe Machinery Company, of the par value of $25 each.

Seventy-five shares of the preferred stock of the United Shoe Machinery Company, of the par value of $25 each.

Ten shares of the capital stock of the Bank of Charleroi, Pennsylvania, of the par value of $100 each.

Seventeen shares of the capital stock of the German-American Trust Company of Paterson, New Jersey, of the par value of $100 each.

Three bonds of the Paterson and Passaic Gas and Electric Light Company, of the par value of $1,000 each.

One bond of the United States Steel Corporation, of the par value of $1,000.

A residence in the city of Paterson, on Arlington street; three automobiles.

Seventeen different parcels of land in the city of Paterson, which he owned as tenant in common with his brother, Walter.

At the time of which I am now speaking (which is in the spring and summer of 1907) the twenty-six shares of Hamilton Trust Company stock and the thirty shares of Silk City Trust Company stock were pledged at the German-American Trust

Company for a loan of $12,000. There had also been obtained from this last-named company, by Joseph Bamford, Jr., either fifteen or sixteen thousand dollars in addition, for which there had been pledged the one hundred and forty-two shares of common and seventy-five shares of preferred stock of the United Shoe Machinery Company, the ten shares of the stock of the Bank of Charleroi, the seventeen shares of stock of the German-American Trust Company, the three $1,000 bonds of the Paterson and Passaic Gas and Electric Light Company, and the $1,000 bond of the United States Steel Corporation. A concern in Pittsburgh, named Ivory, Cascadden & Moore, had taken over this loan and the securities just mentioned as collateral.

Both Walter and Joseph Bamford, Jr., were stockholders in the German-American Trust Company and in the Hamilton Trust Company, and Walter was a director in the Hamilton Trust Company. Before the 2d of March, 1907, according to the testimony of Mr. Parmelee, the treasurer of the Hamilton Trust Company, Joseph was not indebted to that company. Walter, in his testimony before the referee in bankruptcy, stated that it was his understanding that Joseph was indebted in the sum of $10,000 to that company before that time. However this may be, it appears that on the 2d day of March, 1907, Joseph Bamford, Jr., desired to negotiate a note for $10,000 with the Hamilton Trust Company, and it is, of course, immaterial whether this was to renew an existing indebtedness, or for a fresh one. Mr. Parmelee states that he was unwilling to loan this money to Joseph unless Walter should approve; and upon having a conversation with Walter he was requested by Walter to make the loan, and because Walter informed him that he wanted him to loan the money to Joseph, he did so; and, subsequently, Walter endorsed this note. The note was for $10,000, at four months, and became due on the 1st of July, 1907. Pledged with it, as collateral, were the two thousand shares of Bamford Brothers Silk Manufacturing Company owned by Joseph. When this note came due, on the 1st of July, 1907, Walter testifies that he is in doubt whether he endorsed it, that he believes that he only endorsed once—that would be the note of March 2d, 1907. Parmelee, however, testifies that Walter did endorse the note of July 1st, 1907, given in

renewal of the note of March 2d, 1907. It further appears that before this time the fifteen or sixteen thousand dollar note held by Ivory, Cascadden & Moore, with the collaterals attached to it as above set forth, was sent to a Paterson bank for collection; and on the 1st day of July, 1907, Joseph, according to the testimony of Parmelee, applied to the Hamilton Trust Company to advance him, in addition to the $10,000 which he already owed them, $16,000 more to take over the note and securities that had been with Ivory, Cascadden & Moore. Walter, in his answer, says that Parmelee consulted him respecting this, and wanted to know if he would guarantee this $16,000 loan, and that Walter replied that he would if these securities were to be applied toward the liquidation of the note, and that by reason of this "verbal guarantee," he felt himself bound to pay any deficiency. Parmelee says that at the time that they loaned the additional $16,000 it was distinctly understood that the purpose was to get these securities liquidated as quickly as possible so as to pay Joseph's debts. Therefore, the situation, so far as the Hamilton Trust Company and Joseph and Walter Bamford are concerned, on the 1st day of July, 1907, was that the trust company held a note of Joseph Bamford's for $10,000 due November 1st, 1907, with which was pledged two thousand shares of Bamford Brothers Silk Manufacturing Company stock owned by Joseph Bamford, Jr. They also held the note of Joseph Bamford, Jr., for $16,000, which was made payable on demand, and on which Walter Bamford was what he terms "a verbal guarantor."

Joseph Bamford, Jr., was not only obligated on these two notes, but on another one of $12,000, at the German-American Trust Company, and owed more than $80,000 of other indebtedness for which he had given no security. There was a judgment against him, recovered on the 1st day of March, 1907, by the First National Bank of Guttenberg, for something over $5,000, under which his house in Arlington street, Paterson, and his three automobiles had been levied upon. On the 12th day of July, 1907, a summons and declaration were served on Joseph Bamford, Jr., at the suit of Chauncy Ives. The suit was in the Passaic circuit court, and was upon two notes, one of March 27th, 1907, and the other of April 2d, 1907, at three months, aggregating $3,500.

Although there is no proof of any demand having been made on Joseph Bamford, Jr., to pay the $16,000 demand note held by the Hamilton Trust Company, as above set forth, it is proven that on the 12th day of July, 1907 (the same day upon which the summons and declaration above mentioned were served upon Joseph Bamford, Jr.), the Hamilton Trust Company sold at private sale, to Walter Bamford for $965, the $1,000 United States Steel Corporation bond.

Thereafter suits against Joseph Bamford, Jr., were brought as follows:

In the United States circuit court, for the district of New Jersey, by Robert B. Ivory and others on a note of $2,500, dated July 8th, 1907, at ten days; the summons and declaration being served August 2d, 1907.

In the Passaic circuit court the following suits:

By Elmer Conant; summons and declaration served August 16th, 1907, on a note for $500, dated May 2d, 1907, at three months.

By the Tradesmens Oil Company; summons and declaration served October 31st, 1907, on a note dated May 15th, 1907, for $1,000, at three months.

By the Battery Park National Bank; summons and declaration served November 14th, 1907, on two notes, one dated March 27th, 1907, for $1,000, at three months, and one dated April 8th, 1907, for $500, at three months.

By Rudolph Cohen; summons and declaration served November 8th, 1907, on a note of $5,000, dated April 3d, 1907, at three months.

By the Crown Petroleum Company; summons and declaration served on December 2d, 1907, on a note of $1,000, dated July 30th, 1907, at three months.

In each of these suits, beginning as early as July 20th, 1907, and extending to as late as the 9th of December, 1907, affidavits of merits were at various times filed by Joseph Bamford, Jr., and, subsequently, pleas were filed, and most of these cases were postponed upon the request of the counsel of the defendant, so that no judgments were entered until after the voluntary petition in bankruptcy was filed on the 27th of January, 1908.

The proofs show that the collateral deposited with the $16,000 demand note made by Joseph Bamford, Jr., "verbally" guaranteed by Walter Bamford, and held by the Hamilton Trust Company, was sold by the Hamilton Trust Company as follows:

The $1,000 United States Steel Corporation bond, July 12th, 1907, to Walter Bamford for $965.

The seventy-five shares of United Shoe Machinery Company, preferred, part on July 15th and part on July 20th, 1907, for $2,024.37.

The three Paterson and Passaic Gas and Electric Light Company bonds, August 29th, 1907, for $3,010.63.

The ten shares of the Bank of Charleroi, Pennsylvania, stock, September 25th, 1907, to Walter Bamford for $4,000.

The one hundred and forty-two shares of United Shoe Machinery Company, common, September 25th, 1907, to Walter Bamford for $5,680.

The total received from these securities was, therefore, $20,270, which paid the $16,000 note and left a balance of $4,270.

The trust company claims that by virtue of the provisions of the collateral notes taken by it, it was authorized and empowered, whenever any note came due to it, and was unpaid, to shorten the due day of all other notes of the same person and sell all collateral in its possession to pay the total of all notes of the same person held by it; and that, exercising this power, it proceeded not only to sell sufficient collateral to reimburse it for the $16,000 note which was payable on demand, but also the note for $10,000 of July 1st, 1907, which was not due until the 1st of November, 1907; and, therefore, in addition to the sales of the collateral specifically deposited with the $16,000 note, the sale of which as above stated produced an excess of $4,270, it sold the two thousand shares of Bamford Brothers Silk Manufacturing Company's stock (which was deposited as collateral with the $10,000 note) on the 25th day of September, 1907, for $5,000 to Walter Bamford.

Before October 7th, 1907, the German-American Trust Company notified Joseph Bamford, Jr., that unless he paid the $12,000 which he owed it, and for which it held as collateral the twenty-six shares of Hamilton Trust Company stock and the

thirty shares of Silk City Safe Deposit and Trust Company stock, it would, on the morning of that day, at its banking house, sell the said securities; and on that day a representative of Walter Bamford appeared and bid the exact amount of Joseph's indebtedness, and paid for the same with Walter's check, and that stock passed into the possession of Walter.

On the judgment obtained on the 1st of March, 1907, by the First National Bank of Guttenberg against Joseph Bamford, Jr., as before stated, a levy was made upon his dwelling-house in Arlington street, Paterson, and upon three automobiles owned by him; and on the 3d of January, 1908, the above property was sold by the sheriff and purchased by Walter Bamford for $5,000; and since that time Joseph Bamford, Jr., has continued to reside in the said premises and has not paid any rent, although Walter and he swore that Walter charges him with rent at the rate of $40 a month; but they both agreed that he has not paid any, and what is called a "charge" seems to have been entirely in the minds of the parties since they both agree that no account was made of it.

After the sale of all the securities which were pledged to the Hamilton Trust Company by Joseph, Jr., there was still due the Hamilton Trust Company a sum slightly in excess of $1,000, and on the 26th of October, 1907, Walter Bamford paid this amount.

On the 4th of January, 1908, a partition suit was begun in this court by Walter Bamford against Joseph Bamford, Jr., respecting the parcels of land which they owned in common. This bill was filed by Wayne Dumont as solicitor for Walter Bamford, he being the solicitor of Joseph Bamford, Jr., before that time and after that time in all the suits brought against Joseph Bamford, Jr., and his solicitor in the case at bar as well as his attorney in the bankruptcy proceedings. Mr. Dumont, on the witness stand, explained that he represented Walter in that suit because there were judgments against Joseph, or at least one, and that there was a levy upon his property, and that he thought it would be better not to sell Joseph's undivided interest in that property but to have it parted; that he was not able to get any information out of Joseph (although it is difficult to see what informa-

tion he needed for this bill), and that he therefore applied to Walter and secured a consent from Walter to have the bill filed in Walter's name against Joseph. No one appeared for Joseph, and a partition sale was had at which Walter bought the property for $5,000. This was for the whole property. Later, the creditors of Joseph Bamford, Jr., applied to the chancellor and had this sale set aside and a physical partition made, and the trustee in bankruptcy subsequently sold that portion of the land set off to Joseph for $9,000.

As before stated, on the 27th day of January, 1908, a voluntary petition in bankruptcy, the affidavit to which was made on the 24th day of January, 1908, was filed by Joseph Bamford, Jr., Wayne Dumont acting as his attorney. His schedule showed unsecured debts of $81,702.42 and practically no assets whatever, excepting his interest in this undivided real estate and some wearing apparel valued at $200.

From the above recital of facts it therefore appears that after the various transactions above recited, Walter Bamford became and was possessed of property theretofore owned by Joseph Bamford, Jr., as follows:

One $1,000 bond of the United States Steel Corporation; ten shares of the Bank of Charleroi, Pennsylvania; one hundred and forty-two shares of United Shoe Machinery Company, common; twenty-six shares of Hamilton Trust Company; thirty shares of Silk City Safe Deposit and Trust Company; two thousand shares of Bamford Brothers Silk Manufacturing Company; the dwelling-house and lots on Arlington street, Paterson, New Jersey; three automobiles.

Since, for the purposes of this case, the complainant concedes that the prices paid for the other securities or properties were so near their value that no charge of inadequacy of price could properly be made, and the money paid therefor went to creditors of Joseph Bamford, Jr., no relief was asked for at the trial with respect to any of the above transactions excepting those concerning the two thousand shares of Bamford Brothers Silk Manufacturing stock and the dwelling-house on Arlington street, Paterson. The other transactions, therefore, will only be referred to in so far as they are useful in casting light upon the

relevant facts and upon the transactions that are attacked, which are those just mentioned.

Leaving the real estate for separate consideration, the following relevant facts were proven respecting the sale of the two thousand shares of Bamford Brothers Silk Manufacturing Company stock; as before stated, there were six thousand shares of this stock, the par value was $100, and they were owned equally, one-third each, by the father and the two sons. The father was president, Walter was treasurer and Joseph was secretary and general manager or superintendent of the company. A dividend was paid in 1906. The only evidence of the value or worth of these shares was the following: on or about the 30th day of November, 1907, Walter Bamford, as treasurer of the company, caused to be sent to the Dun Commercial Agency, a statement of the financial condition of the company, made by public accountants and certified by them to correctly show such financial standing. By this statement it appears that the excess of assets over liabilities was $943,794.62, which would make the book value of two thousand shares on that day $314,598.21.

The complainant offered no evidence whatever, except this statement as to its value; and neither Walter nor Joseph Bamford, Jr., the defendants, offered any testimony or evidence whatever as to its value, nor did the defendant Walter Bamford make any explanation whatever respecting this financial statement. When examined before the referee in bankruptcy, he refused to testify as to how the profits of the business were divided among the three persons who owned it, further than to say that there had been a dividend in 1906. Concerning other questions of value, he testified that he did not think about such things; and he refused, although ordered to do so, to answer whether he would consider that he suffered any loss if he gave up the stock upon being repaid what he paid for it, with interest and expenses in connection with the purchase.

Both he and Joseph seek to create the impression, by positive statement and suggestion, that from some period in 1906 through 1907, Joseph (who they say was drinking heavily at that time) and Walter were virtually strangers. Joseph testi-

fied before the referee in bankruptcy that after he made the note to the Hamilton Trust Company he ceased drinking; and also that before that time he worked in his position as manager of the mills, with occasional absences due to his habits, and that during such times he saw his brother daily. And the case is filled with acts of Joseph during this period which show that he was attending to business, making notes and signing affidavits and otherwise being as accessible as any other business man for business purposes.

Walter himself testifies that as early as the summer of 1907 it was "public property" that Joseph was in financial difficulties, was being "robbed" or had been "robbed," and either was about to be or was financially ruined. Notwithstanding the implication which these witnesses would convey that these brothers were strangers (although living side by side, and working side by side, and engaged in a mutual enterprise), it is undisputed that the Hamilton Trust Company, of which Walter was a stockholder and a director, and Joseph a stockholder, made the loan of $10,000 to Joseph on the 2d day of March, 1907, solely at the request of Walter and because he stated to Mr. Parmelee that he wished the company to do so. And it is also proven, without contradiction, that after one suit had resulted in a judgment and other suits had been begun against Joseph, the Hamilton Trust Company, after consultation with Walter and upon what he calls his "verbal guarantee," therefor, loaned $16,000 on a demand note made by Joseph Bamford, Jr., and took over the collateral which the former loaner had for that amount; and that this was done with the distinct understanding between Walter and the bank and Joseph that the purpose was to liquidate the securities and pay the banks; and they began immediately (although there is no evidence that up to this time they had made any demand on Joseph to pay this note) to sell these securities, and continued to sell them until they had not only paid the $16,000 note, but had, within a thousand dollars of enough to pay that and the $10,000 note on which Walter was the endorser, and for which the two thousand shares of Bamford Silk Manufacturing Company stock was collateral.

It appears that on the 20th day of September, 1907, the Hamilton Trust Company made their first written demand upon Joseph Bamford, Jr., with respect to the $16,000 note; and it appears from the language of this demand itself that they had already and before that time sold, of the securities deposited therewith, enough to realize $6,000. That demand was as follows:

"September 20, 1907.

"We desire to notify you that we wish to call for payment your demand loan dated July 1st, 1907, for $16,000, on which there has been $6,000 paid, leaving a balance due on same of $10,000.

"We expect this note paid to-morrow before twelve o'clock, otherwise the collateral thereto will be sold, together with the collateral of your note for $10,000, dated July 1st, 1907."

It further appears that on the 23d day of September, 1907, Mr. Parmelee and Joseph Bamford, Jr., had an interview, as the result of which Mr. Parmelee framed the following letter for Joseph Bamford, Jr., to sign, and Joseph Bamford, Jr., did sign it:

"September 23, 1907.

*"Hamilton Trust Company:*

"GENTLEMEN—I beg to acknowledge receipt from you of letter requesting the payment of my demand loan with you amounting to $10,000, and to say that I am unable to comply with your request. As you hold as collateral security for the payment of my loans of $20,000 the following: 142 shares Common Stock, United Shoe Machinery Corporation; 10 shares capital stock, Bank of Charleroi, Pa.; 2,000 shares Bamford Brothers Silk Mfg. Co., I hereby consent that the same be sold at public auction in the City of New York, and out of the proceeds I direct you to pay the amount due the Hamilton Trust Company and retain the balance for the benefit of my other creditors."

Three days before this, and on the 20th day of September, 1907, the trust company had already instructed Adrian Muller & Sons, auctioneers of the city of New York, to advertise the securities just mentioned for sale at their place in New York, on the 25th of September, 1907. Before this it had been agreed between Walter Bamford and Mr. Parmelee that these securities should be sold, and Mr. Parmelee had undertaken to look after Walter Bamford's interests, as the latter was going away for a vacation.

24

On the 25th of September, 1907, these securities were sold at Muller's, and brought the prices which have been before mentioned, namely: the Charleroi stock, $4,000; the Shoe Machinery common, $5,680, and the Bamford Company stock, $5,000, or a total of $14,680. Subsequently, as has been before stated, and on October 26th, 1907, the remaining security in the hands of the Hamilton Trust Company, to wit, the German-American Trust Company stock, was sold for $4,590; and on the same day Walter Bamford paid the difference, which was something over a thousand dollars, to the Hamilton Trust Company, and received the notes of Joseph, Joseph testifies that he never received these notes, and knows nothing about them; and Walter testifies that he does not know what has become of them. Joseph, in fact, throughout his testimony, both before the court in this trial and before the referee in bankruptcy, sought to give the impression that he was practically oblivious to what had happened, and had no knowledge, and was not told anything by anybody. He says that he never knew what had become of his notes or of the large amounts of collateral that were deposited with them; that no one had ever told him. And yet he says that a few days after this Bamford Silk Manufacturing Company stock was sold he was told that he was no longer a stockholder of the company. So here, as elsewhere, it is evident that neither he nor Walter Bamford can be relied upon as giving a truthful version of what took place, or as revealing the transactions between them and the knowledge which each had of the circumstances. Joseph testified before this court that he did speak to his brother about his financial affairs, and that his brother refused to aid him; and Walter testified that Joseph never spoke to him about his financial affairs. Walter also seeks to give the impression that he remembers very little about these important matters and cannot now tell how, in so many instances, he knew exactly when his brother's properties were to be sold, and how he came to be present at the proper time to acquire them, excepting with respect to the Bamford company's stock, which he says that he acquired by reason of an agreement he made with Mr. Parmelee to protect him. It further appears that this sale was held at

Walter's specific request. Mr. Parmelee testifies that he asked Walter to pay the $10,000 note (although it was not due), and take over the stock, but Walter replied that he preferred to have it go to a sale. The reason for this preference is too obvious to require exposition.

After the sale of this stock Joseph continued performing exactly the same duties in the operation of the company's business as he had always theretofore, since its incorporation, performed, namely, he was the active silk maker, superintendent or manager, or whatever title they gave him.

It will have been observed that most of the collateral securities pledged by Joseph and sold by the banks were those which have a recognized value in the market; and it is a significant fact that no such precaution was taken with respect to any other thing as with respect to the Bamford company stock; and that as to that, and when it was determined to sell that, the two written papers were prepared, one the demand of September 20th, 1907, for payment of the demand note of $16,000 and the notice that the collateral held under it, and also under the note not yet due, would be sold; and secondly, the letter prepared by Mr. Parmelee, and signed by Joseph Bamford, Jr., authorizing the sale in New York of this stock. It is also significant, in my judgment, that Walter Bamford abstained from aiding his brother in any of his other enterprises excepting when the stock of the Bamford Brothers Silk Manufacturing Company was pledged as collateral. This was pledged, as will be recalled, on the 2d of March, 1907, to the Hamilton Trust Company, of which Joseph was a stockholder and Walter was a stockholder and director. Joseph at that time did not owe that company any money whatever according to his statement and that of Parmelee. Walter says that he thinks this $10,000 had been theretofore loaned to Joseph. However this may be, it is undisputed that on the 2d of March, 1907, Joseph gave a note with this stock as collateral, and that Walter was not on that note. That loan was made at Walter's request, and would not have been made without his request, and he subsequently endorsed the note. When this note came due he induced the trust company also by what he calls a "verbal guarantee" to

loan $16,000 more to Joseph, taking over a former loan with the attendant collateral. Both he and Parmelee agree that this was done at Walter's request, and with the distinct understanding among them all (that is, Joseph, Parmelee and Walter), that the securities should all of them be liquidated—that is to say, as I understand their testimony, that they should be sold as speedily as possible.

It is impossible, after an impartial consideration of the testimony, to reach the conclusion that Walter, who is the brother of Joseph, who lived next door to him and worked side by side with him in the silk business, and had learned, as he himself says, by common repute, that Joseph was financially embarrassed, if not ruined, did not know, in July, August and September of 1907, that any property of Joseph's which was sold for less than its full value was, to the extent of such excess, being withdrawn from creditors of Joseph. After a most careful consideration of this testimony, I cannot escape the conviction that Walter did know of Joseph's financial condition, knew that he was tremendously involved, probably knew that a judgment had been obtained against him and that other suits were pending, and, either by direct agreement with Joseph, or by some tacit understanding, set out to pay the creditors who had the collaterals in hand their full amounts, and secure to himself whatever equity there was in such collaterals over and above the amounts due the secured creditors.

There is, of course, no direct testimony of any agreement between Joseph and Walter to this effect, as there rarely is in any case of a fraudulent conveyance. But there is sufficient evidence to require any trier of fact to reach the conclusion that Walter knew that Joseph was largely indebted, was in a condition of financial embarrassment of a very high degree, and that the creditors of Joseph had already begun to pursue him and to attempt to reach his assets, and would undoubtedly continue to do so until they had secured their debts, or, at least, disposed of all his available assets in an endeavor to do so.

The question, therefore, to be considered, is, what is the legal effect of these findings, and what remedy is available to the complainant under the law as administered in this court.

First, it will be well to dispose of the charge in the bill that the transactions by which Walter secured Joseph's property constituted a preference within the meaning of the Bankruptcy law. This matter was not subsequently referred to by counsel, and is not mentioned in their briefs, and I assume that they have abandoned such charge.

At the time that Walter purchased any of this property I do not think it would be proper to term him a creditor of Joseph's. At no time did Joseph owe him any money. Whatever rights he might have with respect to Joseph and Joseph's property were with respect to securing himself because he was an endorser upon a $10,000 note of Joseph's. Even if this circumstance constituted him a creditor, the sale of the Bamford stock to Walter took place on the 25th of September, 1907, and although Joseph swore to the voluntary petition in bankruptcy on the 24th of January, 1907, he did not file the same until the 27th of January, 1907, which, as will be observed, was two days more than four months, and the Bankruptcy act only condemns preferences to creditors made within four months of the filing of the petition, and by withholding the petition from the 24th to the 27th a margin of two days is gained in favor of the transfer to Walter.

Since, at the time of the purchase of the real estate, the only other transaction here sought to be impugned, there is no pretence that Walter was a creditor of Joseph's, the Bankruptcy act would not apply to that transaction.

With respect to the real estate, there was proof offered by the defendants from which I conclude that if this transaction stood alone there· would be no occasion to disturb it because of the existence of any such inadequacy of consideration as to suggest fraud or other grounds for attacking or interfering with it.

There is no question that a trustee in bankruptcy is a proper person to bring such a suit as this, and that the debts represented by him are so fastened on the property of the debtor that conveyances which would be held void or voidable at the instance of lien creditors are properly held voidable at the instance of the trustee in bankruptcy. *Levy* v. *Levy* (*Vice-Chancellor*

*Reed, 1904*), *57 Atl. Rep. 1011; Crane* v. *Brewer* (*Vice-Chancellor Howell, 1907*), *68 Atl. Rep. 78.*

The complainant contends that there is sufficient proof to lead the court to find that the transactions attacked were actually fraudulent, with the result that they should be wholly set aside in favor of the creditors of Joseph, Jr. To render this result a just one, the court must find that there was a covinous agreement between Walter and Joseph, Jr., to transfer the property belonging to Joseph with the intent to hinder, delay and defraud the creditors of Joseph, Jr. It is not sufficient to a determination of actual fraud to find that the debtor disposed of or made away with his property with the intent to hinder, delay and defraud his creditors; there must be found, in addition thereto, proof of a participation by the transferee or grantee in such intent. *Murheid* v. *Smith* (*Court of Errors and Appeals, 1882*), *35 N. J. Eq.* (*8 Stew.*) *308* (at *p. 311*); *New York Fire Insurance Co.* v. *Tooker* (*Vice-Chancellor Van Fleet, 1882*), *35 N. J. Eq.* (*8 Stew.*) *408* (at *p. 412*); *Flemington National Bank* v. *Jones* (*Vice-Chancellor Pitney, 1892*), *50 N. J. Eq.* (*5 Dick.*) *244* (at *p. 249*); *affirmed, Ibid. 486;* *Claflin Company* v. *Freudenthal* (*Vice-Chancellor Emery, 1899*), *58 N. J. Eq.* (*13 Dick.*) *298* (at *p. 302*); *Perrine* v. *Perrine* (*Vice-Chancellor Pitney, 1901*), *50 Atl. Rep. 694,* and innumerable cases cited in the notes to *32 L. R. A. 33* and *36 L. R. A. 335.*

Each case, of course, must be judged by its own facts, and if, in the case at bar, moneys paid by Walter had gone to Joseph so that he might have used them as he saw fit, I would be strongly inclined to find that, under the circumstances above detailed, the transactions should be wholly set aside at the instance of Joseph's creditors, and Walter deprived of the property, with the consequent loss of what he had paid. But it is the fact that in the two instances in which the transactions are now under review, to wit, the Bamford stock and the real estate, the transfers were made at sales held at the instance of creditors of Joseph, Jr., one a judgment creditor with an execution, and the other the holder of a collateral note. It is true, and has been firmly established, that in the pursuit of fraud, or in investi-

gating with respect to it, the substance of the transaction is viewed and not its form; and that, therefore, it is immaterial whether such fraud was perpetrated by means of judicial or other public sales, or whether it was by private agreement and transfer. *Metropolitan Bank* v. *Durant (Chancellor Zabriskie, 1871), 22 N. J. Eq.* (*7 C. E. Gr.*) *35; affirmed (Court of Errors and Appeals, 1873), 24 N. J. Eq.* (*9 C. E. Gr.*) *556; Lund* v. *Equitable Life Insurance Co.* (*Court of Errors and Appeals, 1879), 31 N. J. Eq.* (*4 Stew.*) *355; Mechanics National Bank* v. *Burnet Manufacturing Co.* (*Vice-Chancellor Van Fleet, 1881), 33 N. J. Eq.* (*6 Stew.*) *486* (at *p. 489*) ; *affirmed (Court of Errors and Appeals, 1882), 35 N. J. Eq.* (*8 Stew.*) *344; Sands* v. *Codwise, 4 Johns. 536* (at *p. 565*) ; *Farr* v. *Sims* (*1832), Rich. Eq. Cas. 122; 24 Am. Dec. 396.*

But the fact that the transactions attacked are, in each case, sales held at the instance of creditors of Joseph Bamford, Jr., and that the money realized went to pay the legitimate debts of such vending creditors, is important not only with respect to the question of whether there was actual fraud or not, but also upon the question of the relief to be accorded as against the purchaser, namely, Walter Bamford.

In any event, it seems to me that his payment at these sales of money which went to satisfy the legitimate creditors at whose instance these sales were held, entitles him to protection to the extent of such payments. And as bearing upon the question of actual fraud, the nature and circumstances of these sales make it more difficult to find a justifiable basis for determining that there was the kind of actual fraud which the court must find to hold void *in toto* the transfer of the property.

It is true that a man cannot shut his eyes to avoid the responsibility occasioned by seeing what he would otherwise see, and that such circumstances as put one upon inquiry charge him with the responsibility of what he would learn if he properly pursued such inquiry. And with respect to this particular subject, it has been held that creditors or others dealing with a failing debtor are chargeable with such facts as they would have learned had they properly investigated, provided facts were brought to their attention which would lead a reasonable man

in like circumstances to investigate. *Atwood* v. *Impson* (*Chancellor Zabriskie, 1869*), *20 N. J. Eq.* (*5 C. E. Gr.*) *150; Tanlum* v. *Green* (*Court of Errors and Appeals, 1869*), *21 N. J. Eq.* (*6 C. E. Gr.*) *364* (at *p. 369*); *De Witt* v. *Van Sickle* (*Vice-Chancellor Van Fleet, 1878*), *29 N. J. Eq.* (*2 Stew.*) *209* (at *p. 216*); *Holt* v. *Creamer* (*Vice-Chancellor Van Fleet, 1881*). *34 N. J. Eq.* (*7 Stew.*) *181* (at *p. 189*); *New York Fire Insurance Co.* v. *Tooker* (*Vice-Chancellor Van Fleet, 1882*), *35 N. J. Eq.* (*8 Stew.*) *408* (at *p. 412*); *Moore* v. *Williamson* (*Chancellor McGill, 1888*), *44 N. J. Eq.* (*17 Stew.*) *496; Kinmouth* v. *White* (*Vice-Chancellor Pitney, 1900*), *47 Atl. Rep. 1; Russell & Erwin Co.* v. *Faitoute Company* (*Vice-Chancellor Emery, 1905*), *62 Atl. Rep. 421* (at *p. 423*).

Undoubtedly, in this suit, there were circumstances which would have led a reasonable man, circumstanced as Walter Bamford was, to investigate concerning the financial condition of Joseph Bamford, Jr. These transfers were made while suits were pending against the debtor, which is always a suspicious circumstance. *Morris Canal and Banking Co.* v. *Stearns* (*Chancellor Zabriskie, 1873*), *23 N. J. Eq.* (*8 C. E. Gr.*) *414; Randall* v. *Vroom* (*Chancellor Runyon, 1879*), *30 N. J. Eq.* (*3 Stew.*) *353; Hoboken Bank* v. *Beckman* (*Chancellor Runyon, 1882*), *36 N. J. Eq.* (*9 Stew.*) *83* (at *p. 86*); *Christie* v. *Bridgman* (*Vice-Chancellor Green, 1893*), *51 N. J. Eq.* (*6 Dick.*) *331* (at *p. 334*).

The haste to liquidate the securities, the sale of the Bamford stock before the note to which it was attached as collateral was due, the selling of it in New York City without any special notice being given to the public at Paterson, the home of the debtor, the scene of the company's activities, and the natural place for creditors to look for information, are all circumstances casting grave suspicion upon the transaction. The active, willing co-operation of the debtor in having his property sold, contrasted with his supineness and neglect to take any steps to protect himself, are additional factors of importance, and cast light upon the transaction. And while a settlement upon one dependent upon the settler may not be considered as a badge of fraud, dealings between near relatives, one of whom is largely indebted and the

OCTOBER TERM, 1911.

377

9 Buch.                    Horton v. Bamford.

other of whom obtains his property, are viewed with suspicion. *Demarest* v. *Terhune* (*Court of Errors and Appeals, 1867*), *18 N. J. Eq.* (*3 C. E. Gr.*) *532; Gnichtel, Receiver,* v. *Jewell* (*Court of Errors and Appeals, 1899*), *59 N. J. Eq.* (*14 Dick.*) *651.*

Walter himself testified in the bankruptcy proceeding that in the summer of 1907, long before the transactions complained of, it was "public property" in Paterson that his brother was in the hands of "robbers," was in a poor financial condition, and either was or shortly would be financially ruined. The very fact that the Hamilton Trust Company (of which both Joseph and Walter were stockholders, and from its inception had been directly or indirectly depositors) would not loan money to Joseph, although he did not at that time owe them anything, was sufficient to put Walter upon inquiry as to why this was so; and the fact that subsequently it was only at his request and insistence that it made the second loan to Joseph, likewise must be held, in law, to have advised him that Joseph's position was very precarious, and that the presence of other debts was the occasion of his being brought into the matter. In fact, the conclusion is inevitable that Walter either knew, or must in law be charged with knowing, that Joseph was heavily indebted, and, unless someone came to his rescue, would lose a large part, if not all, of his property, which, as has been above shown, was considerable.

As I understand the law, if one is affected with such knowledge, and purchases the property of the debtor, even in the absence of proof of a participation with the debtor in an intention to hinder, delay and defraud the creditors of the debtor, he must either pay approximately the value of the property that he takes of the debtor, or take the risk of being held responsible for any inadequacy if it is of such an amount as to show that the sale to him was not a fair and proper one under the circumstances. This rule has been held not only with respect to creditors of the debtor who take property from the debtor and who are held liable for the excess over the amount of their debt, but also as to purchasers not creditors.

This doctrine is based upon the theory that with respect to all of the property transferred in excess of consideration the convey-

ance is voluntary and therefore fraudulent.    See Chief-Justice
Beasley's statement in *Demarest* v. *Terhune* (*Court of Errors and*
*Appeals, 1867*), *18 N. J. Eq.* (*3 C. E. Gr.*) *532* (at *p. 539*).

The same learned justice, in *Haston* v. *Castner* (*Court of Er-*
*rors and Appeals, 1879*), *31 N. J. Eq.* (*4 Stew.*) *697*, held that
as to a voluntary conveyance made by one who is indebted, there
was an irrebuttable presumption of fraud; and this has since
been followed in this state, the citations being too numerous for
inclusion.    This doctrine with respect to voluntary conveyances
was first laid down in its extreme vigor in the case on which
Chief-Justice Beasley relies, decided by Chancellor Kent in 1818
—*Reade* v. *Livingston, 3 Johns. Ch. 481.*

Professor Pomeroy (*2 Pom. Eq. Jur.* (*3d ed.*) *p. 1799 § 972*
*et seq. notes*) in commenting upon this doctrine and the cases,
says that Chancellor Kent misinterpreted the English cases, and
that the later English cases have repudiated the doctrine, as have
the later New York cases, and that it has either been repudiated
or never adopted in various other jurisdictions.    He says that the
true doctrine is to consider a voluntary conveyance made by one
who is indebted as a badge of fraud, and to take into considera-
tion all of the other elements in reaching a decision as to whether
it is or is not fraudulent under the statute.

Since the rule which makes a voluntary conveyance absolutely
void as against creditors is applied in cases where the grantee or
transferee is admittedly free from any actual fraud or participa-
tion, and since the statute has been construed to require a finding
of actual participation by the grantee or transferee before it is
operative, it may be that the doctrine of irrebuttable presumption
of fraud is not a satisfactory basis for these decisions, and that
they are more properly justifiable under the general jurisdiction
of the court of equity irrespective of the statute than by ground-
ing them upon the statute by using the presumption as a means
of doing so.

Our statute (*2 Gen. Stat. p. 1604 § 12*) is a modern rendering
of the English statute of *13 Eliz. c. 5;* and the latter has, in
cases too numerous for citation, been held to be merely declara-
tory of the common law respecting this subject-matter, Lord
Mansfield remarking, in *Cadogan* v. *Kennett, Cowp. 434:* "The

principles and rules of the common law as now universally known and understood are so strong against fraud in every shape that the common law would have attained every object proposed by the statutes *13* and *15 Eliz.*"

In the following text-books and cases and the notes referred to will be found many statements of this doctrine: *May Fraud. Conv.* \**3; Story Eq. Jur. (13th ed.)* § *352; Hamilton* v. *Russell (1803), 1 Cranch 309,* and citations in *Rose's Notes to the U. S. Reports; Clements* v. *Moore (1867), 73 U. S. 299;* L. *Ed. 786,* and *Rose's Notes* thereto; *Hudnall* v. *Wilder, 17 Am. Dec. 744,* notes and extra annotation in the new edition; *Farr* v. *Sims, 24 Am. Dec. 396,* notes and extra annotation in the new edition.

In our own courts of equity there will be found to have been exercised a jurisdiction concerning this subject-matter which I can only justify upon the theory that inherent equitable powers were being exercised irrespective of any statute. *Disborough* v. *Outcalt (Chancellor Vroom, 1831), 1 N. J. Eq. (Saxt.) 298* (at *p. 307*) ; *Crane* v. *Conklin (Chancellor Vroom, 1831), 1 N. J. Eq. (Saxt.) 346* (at *p. 353*) ; *Cook* v. *Johnson (Chancellor Williamson, 1858), 12 N. J. Eq. (1 Beas.) 51* (at *p. 53*) ; *Robert* v. *Hodges (Chancellor Green, 1863), 16 N. J. Eq. (1 C. E. Gr.) 299* (at *p. 302 et seq.*) ; *Demarest* v. *Terhune (Court of Errors and Appeals, 1867), 18 N. J. Eq. (3 C. E. Gr.) 532* (at *p. 539 et seq.*) ; *Tantum* v. *Green (Court of Errors and Appeals, 1869), 21 N. J. Eq. (6 C. E. Gr.) 364; Walsh* v. *Rosso (Vice-Chancellor Pitney, 1898), 41 Atl. Rep. 669;* same case on final hearing (*Vice-Chancellor Stevens, 1899), 59 N. J. Eq. (14 Dick.) 123.* See, also, *Sands* v. *Codwise, 4 Johns. 536* (at *pp. 560, 596*) ; *4 Am. Dec. 305; Story Eq. Jur.* § *373.*

And with respect to the specific application of this doctrine to the facts in the case at bar, it will be found that it is thoroughly settled that in the absence of satisfactory proof of actual fraud, the alienation will be sustained to the extent of the consideration actually given, and declared voluntary and void as to the residue. *Coley* v. *Coley (Chancellor Green, 1862), 14 N. J. Eq. (1 McCart.) 350; Demarest* v. *Terhune (Court of Errors and Appeals, 1867), 18 N. J. Eq. (3 C. E. Gr.) 532; Morris*

*Canal and Banking Co.* v. *Stearns* (*Chancellor Zabriskie, 1873*), *23 N. J. Eq.* (*8 C. E. Gr.*) *414; Muirheid* v. *Smith* (*Court of Errors and Appeals, 1882*), *35 N. J. Eq.* (*8 Stew.*) *309; Withrow* v. *Warner* (*Court of Errors and Appeals, 1898*), *56 N. J. Eq.* (*11 Dick.*) *795; Moore* v. *Williamson, 44 N. J. Eq.* (*17 Stew.*) *496; 1 L. R. A. 336; Wheeler & Wilson* v. *Litwin* (*Court of Errors and Appeals, 1898*), *57 N. J. Eq.* (*12 Dick.*) *660; Gnichtel, Receiver,* v. *Jewell* (*Court of Errors and Appeals, 1899*), *59 N. J. Eq.* (*14 Dick.*) *651; Merchants Building and Loan Association* v. *Barber* (*Vice-Chancellor Bird, 1894*), *30 Atl. Rep. 865; Kinmonth* v. *White* (*Vice-Chancellor Pitney, 1900*), *47 Atl. Rep. 1; Perrine* v. *Perrine* (*Vice-Chancellor Pitney, 1901*), *50 Atl. Rep. 694; O'Connor* v. *Williams* (*Vice-Chancellor Pitney, 1902*), *53 Atl. Rep. 550;* and see cases collected in note to *21 L. R. A.* (*N. S.*) *222.*

There is no question that under the statute there must be found to have been an actual intent on the part of both parties to hinder, delay and defraud creditors, and that as a necessary ingredient there must be proof satisfactory to the court of the participation of the grantee or transferee in such fraudulent intention. (See cases previously cited.) Whereas, in the case of a voluntary conveyance, or one which, as above stated, is found to be voluntary as to the excess over proper consideration, and in many of the cases above cited, the relief accorded to the creditors as against transfers of the debtor, is admittedly not based upon a finding of participation by the grantee or transferee in any fraudulent intent.

Mr. Justice Swayne, speaking for the supreme court of the United States, in *Clements* v. *Nicholson, 6 Wall. 299; 18 L. Ed. 786,* said, respecting the jurisdiction exercisable in equity in this respect:

"It remains to consider the law applicable to this state of facts.

"The statute of thirteenth Elizabeth has been substantially enacted in Texas. The same legal principles apply there in this class of cases as in the other states where similar statutory provisions exist. As was remarked by Lord Mansfield, in *Cadogan* v. *Kennet, 2 Cowp. 432,* the common law, without the statute,

would have worked out the same results. A sale may be void for bad faith, though the buyer pays the full value of the property bought. This is the consequence where the purpose is to aid the seller in perpetrating a fraud upon his creditors, and where he buys recklessly, with guilty knowledge. When the act of fraud is established in a suit at law, the buyer loses the property without reference to the amount or application of what he has paid, and he can have no relief either at law or in equity. When the proceeding is in chancery, the jurisdiction exercised is more flexible and tolerant. The equity appealed to, while it scans the transaction with the severest scrutiny, looks at all the facts, and giving to each one its due weight, deals with the subject before it according to its own ideas of right and justice. In some instances it visits the buyer with the same consequences which would have followed in an action at law. In others, it allows a security to stand for the amount advanced upon it. In others, it compels the buyer to account only for the difference between the under price which he paid and the value of the property. In others, although he may have paid the full value and the property may have passed beyond the reach of the process of the court, it regards him as a trustee, and charges him accordingly. Where he has honestly applied the property to the liabilities of the seller, it may hold him excused from further responsibility. The cardinal principle in all such cases is that the property of the debtor shall not be diverted from the payment of his debts to the injury of his creditors by means of the fraud."

It therefore seems that if these conveyances thus condemned were so condemned upon the ground that equity "requires a man to be just before he is generous," and that when he is indebted his property is held by him for his creditors, and must not be diverted from them, unless its equivalent is put in its place for them, there is a broader and more reasonable theory to use in favor of creditors than by resorting to presumptions which do violence to the proven facts of the case; and such theory seems to square itself with each of the cases in which this relief is accorded, as has been suggested by the note-writer annotating Lawyers' Reports Annotated (*5 L. R. A. (N. S.) 395*), *note.*

Trusts and frauds have always been peculiarly within the ju-

risdiction of equity, and it is eminently proper that that court should hold that since a man must be just before he is generous, and since when he is indebted he holds his property so to say in trust for his creditors, he will not be permitted, as against his creditors, to give away his property, and when he attempts to do so, the court will nullify that attempt, holding that it is fraudulent for the grantee or transferee to accept and hold the same as against the creditors, and that it is impressed with a trust in their favor.

It need hardly be remarked that courts have been always zealous of the rights of creditors; and Story points out that from the earliest period in civilized nations attempts of the debtor to obstruct the creditor have been disapproved and circumvented as occasion required. *Story Eq. Jur. (13th ed.)* § *350 et seq.*

However, whether the theory just suggested or the earlier one of an irrebuttable presumption of fraud is a correct one, the result, of course, is the same, and there can be no doubt that as to so much of the conveyance as is voluntary, it is the right of the creditor in this court to have it set aside in his behalf; the cases to establish which have been above cited.

The doctrine with respect to conveyances upon some consideration, and therefore unattackable at law, but subject to attack in equity, was first clearly laid down by Chancellor Kent in *Boyd* v. *Dunlap (1815), 1 Johns. Ch. 478;* and this was adopted in New Jersey by Chancellor Green in *Beeckman* v. *Montgomery (1861), 14 N. J. Eq. (1 McCart.) 106* (at *p. 113*); and has since been followed in *Coley* v. *Coley (Chancellor Green, 1862), 14 N. J. Eq. (1 McCart.) 350* (at *p. 354*), and *Demarest* v. *Terhune (Court of Errors and Appeals, 1867), 18 N. J. Eq. (3 C. E. Gr.) 532* (at *p. 539*); and cited with approval in *Robinson* v. *Urquhart (Chancellor Williamson, 1858), 12 N. J. Eq. (1 Beas.) 515* (at *p. 537*); *Lashley* v. *Souder (Vice-Chancellor Pitney, 1892), 24 Atl. Rep. 919* (at *p. 921*), and the principle has been applied in all of the numerous cases above cited holding that a court of equity will decree a conveyance voluntary for any excess of such an amount as to shock its conscience over the actual value of the consideration given for the property conveyed or transferred.

As formulated by the court of errors and appeals in the case of *Withrow* v. *Warner, 56 N. J. Eq. (11 Dick.) 795,* it is as follows: "Where in a court of equity a deed is sought to be set aside as voluntary and fraudulent as against creditors, and the evidence is not sufficient to induce the court to avoid the deed absolutely, but is sufficient to excite a well-grounded suspicion as to the adequacy of the consideration and the fairness of the transaction, the court will permit the conveyance to stand as security for the consideration actually given."

And in the case at bar all of these elements surely exist. There is apparently a great inadequacy of consideration with respect to the Bamford stock. The value of the two thousand shares, as shown by its books, according to a statement approved of by Walter Bamford, at a time very shortly after this stock was acquired by him, exceeded $314,000, for which he paid $5,000. The circumstances, which have been stated in considerable detail, certainly were such as to arouse suspicion. Walter Bamford was undoubtedly chargeable in law with the responsibility of investigating if he wished to hold what he was about to acquire in its entirety; and if he had investigated he would have found that Joseph, Jr., was not in such position that the law would permit him to give away, as against his creditors, any property.

Whether this doctrine, as applied in this state, would have protected Walter Bamford under the circumstances if he had paid what he did pay directly to Joseph, Jr., I do not consider nor attempt to pass upon, because I find that it has been settled in this state that where the consideration paid went to satisfy legitimate debts of the debtor, the purchaser will be protected to that extent; and as that is the case in the suit at bar, it is proper to apply the principle thereto. *Smith Company* v. *O'Brien (Vice-Chancellor Pitney, 1898), 57 N. J. Eq. (12 Dick.) 365; Gray* v. *Folwell (Vice-Chancellor Pitney, 1898), 57 N. J. Eq. (12 Dick.) 446* (at *p. 455*).

It is contended by the complainant that he has affirmatively shown that the consideration paid by Walter for Joseph's stock was inadequate. He bases this contention upon the following: that where there is no evidence as to the value of stock, the par value is presumed to be its value; and for this he cites

*Harris' Appeal*, 12 Atl. Rep. 743; Moffitt v. Hereford, 132 Mo. 513; Brinkerhoff v. Home Lumber Co., 118 Mo. 447; Cook Corp. (5th ed.) § 581. And he contends that he has further shown this by proving the statement approved by Walter Bamford showing the book value of the stock; and cites authorities which he says show that where there is no known market value, the value may be proven by showing the value of the property and the business of the corporation, less the amount of its liabilities, citing therefor, *Cook Corp.* (5th ed.)· § 581, and the numerous cases there cited, and also *Sedgw. Dam.* (8th ed.) § 257; Moraw. Corp. (2d ed.) § 288; Industrial, &c., Co. v. Tod, 180 N. Y. 215, 232. And with respect to the fixing of the value of bonds, *O'Brien* v. *Home Benefit Society*, 117 N. Y. 310. But in my view of the facts in this case and the law applicable thereto, the complainant should succeed even though it be not found that he has established by affirmative proof the value of the stock as the basis of charging that the amount paid for it was inadequate. In my view (in which I find myself supported by the authorities), the proven facts with respect to Walter's conduct and Joseph's financial condition cast the burden upon Walter of proving, in view of the apparent inadequacy, what the actual value of the thing purchased was, so that the court could determine that his conduct with respect thereto was fair and equitable, and that in holding it he is not fraudulent with respect to any excess of the value of the thing bought over the price paid. *Demarest* v. *Terhune* (*Court of Errors and Appeals, 1867*), 18 N. J. Eq. (3 C. E. Gr.) 532; Murheid v. Smith (*Court of Errors and Appeals, 1882*), 35 N. J. Eq. (8 Stew.) 309, 312; Hoboken Bank v. Beckman (*Chancellor Runyon, 1882*), 36 N. J. Eq. (9 Stew.) 83 (at p. 86) ; Colgan v. Jones (*Court of Errors and Appeals, 1888*), 44 N. J. Eq. (17 Stew.) 274; Withrow v. Warner (*Court of Errors and Appeals, 1898*), 56 N. J. Eq. (11 Dick.) 695; Gnichtel, Receiver, v. Jewell (*Court of Errors and Appeals, 1899*), 59 N. J. Eq. (14 Dick.) 651; Adoue v. Spencer (*Court of Errors and Appeals, 1900*), 62 N. J. Eq. (17 Dick.) 782 (at p. 785) ; Perrine v. Perrine (*Vice-Chancellor Pitney, 1901*), 50 Atl. Rep. 694.

It will be recalled that this defendant Walter Bamford, is shown to have himself approved of a statement which, if true, would make the book value of these two thousand shares over $314,000, and that he paid $5,000 for them; and there is, therefore, indubitably an apparent inadequacy of consideration of so great an amount as to fulfill all the cases which deal with inadequacy which will move the court, and which place him, as I have before said, in a position where I find the burden was upon him to justify the transaction. He has not only failed to sustain this burden, but does not even attempt to do so; and, in fact, when questioned in the bankruptcy court, refused to answer the questions which would cast any light upon this subject.

I do not find from the facts that there is any such apparent disparity of value between the thing bought and the price paid with respect to the real estate; and, therefore, in view of the fact that what was paid for it went directly to a judgment creditor with the result that I have above stated, I do not purpose administering any relief to the complainant with respect thereto.

With respect to the two thousand shares of Bamford Brothers stock I do find that they were acquired by Walter Bamford under such circumstances that he can only be protected with respect thereto to the extent of the money which he actually paid and which went to the creditors at whose instance the sale was had. This amount, it will be recalled, was $5,000.

The remaining question is with respect to the remedy.

Finding, as I do, that Walter Bamford has a first right or lien to be repaid the amount of money which he paid to the legitimate creditor of Joseph in this behalf, and finding that any excess of value of the stock over the amount necessary to repay Walter is available for the creditors, equity would be done by requiring a sale of the stock after the lien of Walter has been protected. It would not do to order a sale with a proviso that out of the moneys received Walter should be first paid, because if the stock did not bring sufficient to repay Walter, then an inequity would be done him. Therefore, the complainant must give bond, satisfactory to the court, to indemnify Walter

for the amount that is found to be due him on the transaction. And then, after such indemnity has been given, the stock shall be sold, and if it brings sufficient to pay Walter and a surplus, the fund shall be thus distributed. It it does not bring sufficient, then, of course, to the extent that it goes, the money should be paid to Walter on account of his claim, and the balance would be paid him out of the indemnity bond given herein. This relief I find in accordance with the practice and principles enunciated and illustrated by the following cases; *Beeckman* v. *Montgomery* (*Chancellor Green, 1861*), *14 N. J. Eq.* (*1 McCart.*) *106; Demarest* v. *Terhune* (*Court of Errors and Appeals, 1867*), *18 N. J. Eq.* (*3 C. E. Gr.*) *532* (at *p. 540*); *Roe* v. *Moore* (*Court of Errors and Appeals, 1882*), *35 N. J. Eq.* (*8 Stew.*) *526; Cole* v. *Lee* (*Court of Errors and Appeals, 1889*), *45 N. J. Eq.* (*18 Stew.*) *779; Withrow* v. *Warner* (*Court of Errors and Appeals, 1898*), *56 N. J. Eq.* (*11 Dick.*) *795; 1 L. R. A. 336.*

The decree will be settled upon notice.