THE CLINTON STATION GENERAL MERCHANDISE AND MANUFACTURING COMPANY *vs.* HUMMELL and wife.

The avails of a wife's labor in her husband's business belong to him, and property purchased therewith, in the name of the wife, cannot be held by her against her husband's creditors.

On final hearing on pleadings and proofs.

*Mr. G. A. Allen,* for complainant.

*Mr. J. N. Voorhees,* for defendant.

THE CHANCELLOR.

This is a creditor's bill. The complainants on the 9th of October, 1871, recovered a judgment in the Supreme Court of this state, against Cornelius S. Hummell, for $2089.44 damages and costs, on which they issued a *fieri facias de bonis et terris,* under which they caused a levy to be made by the sheriff of Hunterdon county, on the right, title, and interest of the defendant in certain land and premises, being a

dwelling-house and lot at High Bridge, in that county, which they seek by this proceeding to subject to the payment of their debt. The title to that property is in the defendant, Harriet Hummell, wife of the judgment debtor. The complainants allege that in 1868, Cornelius Hummell bought this lot for $250 and paid part, $50, of the purchase money, in cash, and with his wife, gave a mortgage on the premises to secure the payment of the rest, and that he then built on the property a dwelling-house, for the occupation of himself and family, in which he has resided ever since it was finished. They allege that the property is actually his, though the title is held by his wife, and that the title is so held in order to defeat his creditors. The defendants answered. They allege that the lot was purchased by the wife, and that the $50 paid on account of the purchase money was her own money, and that she built the house (which they say is of the value of only about $1200, instead of $4000, as alleged in the bill,) and paid all that was paid for its construction; that of the amount she so paid, she obtained $800 from one Mary Alpaugh, on a mortgage on the property, and that the work was done by her husband's workmen, (he was a builder and superintended it,) under an agreement between her and him by which she agreed to board his workmen in consideration of receiving from him the amount of their board. The evidence shows very clearly that the lot was purchased and the house built with money which was by law the property of the husband. The $50, to which reference has been made, paid by her as the first payment on account of the purchase money of the lot, was given to her by her husband for the purpose. It is true they testify that he owed it to her—that it was money he had borrowed of her. Their account of the loan, however, is that three days after they were married, which was six or seven years previous, he borrowed $15 of her, and afterwards they sold a cow her father had given her, and she permitted her husband to take the proceeds of the sale—$18, and that she also lent him $19.50 which she had earned by washing and mending for a person. But Andrew

Creger, from whom the purchase was made, swears that she told him in the negotiation, that she expected to borrow the amount of the first payment, this very $50, from her father, or her brother Edward. Neither she nor her husband pretend that she had any more than the $50, for he says she expected to get the balance of the purchase money from her brother. Now how was this house paid for? It cost over $1600, according to the undisputed evidence: the lumber, $800, the carpenter work, $300, the mason work, $300, the slate roof, $140, the tinning, $25, and the painting, $95, in all $1650. Of this they say $800 were paid by the money borrowed of Mary Alpaugh on mortgage of the property. The bill for painting was paid by the husband out of money he received from Christopher Hann, for work he had done for the latter in building a house. One of the masons swears that the husband paid him nearly all his bill for work, and the rest of his claim is unpaid. The tinner testifies that the husband paid him his bill for tin work. The roofer, who found the slate and put it on, has not been paid at all. The husband employed all those persons to do the work they did on the house. He is shown to have worked on the house, himself. He says his apprentice framed it under his directions. As to the money which his wife was to have received for boarding the workmen, that was clearly the husband's property. He furnished the table. The avails of a wife's labor, under such circumstances, belong to her husband. *Belford* v. *Crane*, 1 C. E. *Green* 265; *Skillman* v. *Skillman*, 2 *Beas.* 403; *Cramer* v. *Reford*, 2 C. E. *Green* 367; *Quidort's Adm'r* v. *Pergeaux*, 3 C. E. *Green* 472. The house probably cost more than the amount above stated—$1650. Witnesses for the complainants, apparently capable of judging and forming a reliable estimate, place its cost at from $2000 to $2500. The husband says he kept no account of its cost. The conclusion appears to be irresistible, that this property was bought for the husband and with his money; that the house was built by him, and as far as it was paid for was paid for with his money, or the money raised by mort-

gage given by him and his wife on the property. His wife cannot hold the property against his creditors. The complainants' debt will be decreed to be a charge upon the premises, which will, if necessary, be ordered to be sold to pay the encumbrance. The complainants are entitled to costs.