Complainants are judgment creditors of the defendants John Carroll and Florence Carroll, his wife. Complainants Sweney and Kip are receivers (appointed by the United States district court) of Passaic-Bergen Lumber Company, a New Jersey corporation, which recovered judgment totaling $811.71 on December 15th, 1933 — and the original bill was filed by them. Complainant Reiss Bros., Inc., subsequently recovered its judgment, totaling $354.21, on June 23d 1934, and thereafter joined as co-complainant.
The judgments of both these creditors are recoveries for the price of materials furnished by them for the construction of a house upon a certain lot known as No. 38 Derwent avenue, Verona, New Jersey, and all of these materials actually *Page 210 
were used and went into the construction of that house. These materials were purchased or ordered by the defendant Florence Carroll, wife of John. The lot on which the house was erected was purchased just prior to the erection of the house. The contract for the purchase of the lot was made by, and in the name of, the said Florence Carroll, as vendee, and both the first down payment and the final payment on consummation of this purchase, were made by the said Florence Carroll, but the deed delivered by the vendor on such consummation was made out in the names of the seven children of Florence Carroll, as grantees, instead of to Florence Carroll herself — and this was at the instance and direction of the said Florence Carroll, and intended for and accepted by her as, the performance of her contract of purchase.
Neither the said Florence Carroll or John Carroll have any assets standing in their names, out of which satisfaction of the judgments can be made. Complainants, by their bill, seek to subject the lot aforesaid (and the house thereon erected) to liability for the satisfaction of the judgments. The theory and contention of complainants is that the said lands were the property of Florence Carroll and that there was a conveyance by her to her children in fraud of her creditors; that on her contract to purchase the lot she became the equitable owner thereof, and her taking title in the name of her children without any consideration moving from them was equivalent to a voluntary deed of conveyance from her to them; and that she was left without sufficient assets to pay her obligations, and hence such conveyance was in fraud of creditors and the children's title is subject to a trust in favor of her creditors to the extent necessary to pay the amounts of their judgments. They ask decree that the property be adjudged the property of Florence Carroll, at least to the extent of the amount of their judgment, and subject to the lien of those judgments.
The proofs show and defendants admit, that the purchase price of the lot was paid by Florence Carroll, and as well also the cost of the construction of the house (other than complainants' claims), — out of moneys in a bank account in her *Page 211 
individual name; that these payments were made by checks on the account signed by her individually, except as to some cash payments, for which the cash was obtained by checks drawn by, and cashed for, her out of the same bank account; that the materials furnished by complainants were ordered by her or her husband and that she promised to pay for the same; that complainants had no knowledge of any interest of Frederick Carroll or the children. They did, of course, have constructive notice of the title of the children, from and after the recording of the deed on June 7th, 1933, — which date was after some deliveries of materials had been made, but prior to other deliveries.
By way of opposition to complainants' theory and contention, the defendants contend that the property was not the property of Florence Carroll, either at law or in equity. She testifies, with some corroboration, that the moneys in this bank account did not belong to her individually, but were given to her by her brother-in-law, Frederick Carroll, now deceased, in trust, as a gift to the seven children (his nieces and nephews) to be used in the purchase for them of this lot and the construction thereon, for them, of the house.
The main dispute at the hearing was over the question of whether the moneys in the bank account did in fact belong to Florence Carroll individually, or to her merely as trustee as she claimed. She admitted that divers payments were made by her out of this account for living expenses for her family and that one check thereon for $1,200 was given as a loan to a brother-in-law (to enable him to buy an auto truck for himself) and never repaid.
Consideration of the situation and the evidence however leads to the conclusion that it is not shown that Florence Carroll was a trustee for the children, of the moneys in question. We may assume that the story told by Florence Carroll on the witness stand is true, — (and it may be said that she gave the impression of frankness and credibility). The evidence on the part of defendants is that check was drawn by Frederick Carroll in favor of Florence Carroll for $6,000 and deposited as the initial deposit in the bank account opened in her name, and that later an additional amount of *Page 212 
$2,500 was so deposited; that this was done with the intent and understanding that Mrs. Carroll should purchase the lot and build the house for the benefit of the children; that the further understanding was that Florence Carroll and her husband, and the children were to live in the house and that Frederick Carroll himself was also to live therein (he was an invalid or semi-invalid), and an apartment for him was planned and constructed in the attic of the house; that those payments which were made out of this bank account for purposes other than payment for the lot and the building of the house were partly for the benefit of Frederick Carroll and were all made (including the loan of $1,200 to the brother-in-law) only at the instance and direction of Frederick Carroll and (except for the $1,200 loan) were of no very large amounts; that the house and lot cost about $7,500 all told, of which about $6,300 was actually paid by Mrs. Carroll. (The judgments of the complainants aggregate nearly $1,200.)
It is clear from defendants' evidence that Mrs. Carroll received these moneys, not as a gift to herself, but as a fiduciary. The question is, for whom she was such fiduciary? There is no evidence as to any clear or definite terms of trust, written or oral. The terms of that trust must be spelled out as well as can be done from the entire evidence, — including the acts of the parties as well as the incomplete testimony as to their understanding and agreement. This evidence does not show that Mrs. Carroll was to hold the moneys solely for the benefit of the children, even for the special purpose of procuring the lot and building the house for them. It does not show a trust with the children as the equitable owners of the moneys. If such were the trust, Mrs. Carroll would have had no right to use or dispose of any of the fund, even with the consent or direction of the donor, for the benefit of any one other than the children, nor for any purpose other than procuring the house and lot. The use of some of these moneys for the benefit of herself and the donor and for the loan to a third party directed by the donor, would have been a breach of trust and a criminal act. The presumption is against her doing a criminal act. Moreover, it *Page 213 
was perfectly apparent from her testimony and the manner of her giving it, that it had never occurred to her that there could be any question as to Frederick Carroll's right to direct the use of these moneys for purposes other than the house and lot, — for any purposes he saw fit.
The necessary inference from the evidence as a whole, is that Florence Carroll was a fiduciary for Frederick, — that she was simply acting as his agent in holding these moneys and in disbursing them according to his directions, and that she was also acting as his agent in purchasing the lot, taking deed to the children as owners, ordering materials and contracting for the erection of the house; and it will be so held. That being so, the obligations and indebtedness so incurred by her to the complainants were the obligations and debts of Frederick Carroll, her principal.
The fact that she also incurred liability, individually, to complainants, by acting as agent for an undisclosed principal, or by holding herself out as the owner of the property and/or as being the actual debtor, is of course immaterial on this point. See Greenburg v. Palmieri, 71 N.J. Law 83. It is clear from the evidence in this case that the complainants had no knowledge prior to recovering their judgments that Florence Carroll was only an agent for Frederick Carroll or for any one else. Indeed they do not know yet, — and will not know unless and until it be legally determined in this suit or elsewhere, — whether Florence Carroll was principal or agent. Hence their right to relief against Frederick Carroll (or his voluntary grantees), as the principal, is not terminated or precluded by the fact that they have recovered judgments against Florence Carroll prior to knowledge by them that she was an agent.
Although, as has been said, it is the opinion of this court, that the moneys and the property and the obligations and debts were, in equity, those of Frederick Carroll and not of Florence Carroll, it is not perceived that it makes much, if any, difference in the determination of this suit whether they were those of Frederick or of Florence. The relief sought herein is not against either of them personally, but against the property, to which the children now have the legal title, *Page 214 
whether it came to them from Florence or from Frederick. Florence has no assets (nor John); Frederick is dead and left no assets. The difficult question in the case is whether or not complainants have any right to relief against the property to which the children have title. The equitable principles upon which this must be determined would be the same if the debt was incurred and the property transferred by Florence as they are on the finding that the debt was incurred and the property transferred by Frederick.
It is of course obvious that where A. purchases lands, paying for the same out of his own funds, but causing the deed to be executed and delivered to B., who pays nothing, the transaction is equivalent to a voluntary conveyance from A. to B. The same would be equally true of a similar transfer of personal property; and such a transfer of a lot of land, followed by A.'s construction of a house thereon, at his own expense and with no consideration from B., would in the whole be equivalent to a voluntary transfer of the house and lot from A. to B., — or it may also be viewed as a voluntary transfer by A. of the moneys paid for the lot and the construction of the house. And where a debtor purchases and pays for property but title is taken in the name of another, that property is just as available to creditors as it would be if the debtor had first taken title in his own name and then transferred it. Clinton Station, c., Co. v.Hammell, 25 N.J. Eq. 45, affirmed, 27 N.J. Eq. 497. Haggerty v.Nixon, 26 N.J. Eq. 42; Conover v. Ruckman, 36 N.J. Eq. 493.
The same is true under the provisions of the Uniform Fraudulent Conveyance act, P.L. 1919, c. 213, p. 500, par. 1.
It is firmly established in this state that a conveyance to one who pays no consideration, is voidable at the instance of creditors of the transferor existing at the time of transfer, irrespective of any conscious plan or intent to defraud, on the part of the transferor, and irrespective of any participation by the transferee in any fraud, actual or constructive, and irrespective of the pecuniary condition of the transferor at the time of transfer. Haston v. Castner, 31 N.J. Eq. 697, p. 701et seq.; Horton v. Bamford, 79 N.J. Eq. 356, at p. 378, etseq., 81 Atl. Rep. 763. In the first of these cases *Page 215 
it is said (in effect) that where a voluntary conveyance is made by one who is indebted, there is an irrebuttable presumption of fraud and the statute operates in favor of those creditors. In the latter case, Vice-Chancellor Garrison rests the jurisdiction of this court not merely on the statute, but on an inherent jurisdiction in equity to relieve creditors against the effect of voluntary conveyances by their debtors, on the ground that a man is required "to be just before he is generous," and the theory that there is a trust or quasi trust in a debtor's property in favor of his creditors, (pp. 379-382). See also Fed. ReserveBank, c., v. Slotoroff, 117 N.J. Eq. 419, 177 Atl. Rep. 243.
The proofs in the instant case show that no consideration whatever was paid by the children, to whom the moneys of Frederick were from time to time transferred in the shape of the lot and the materials and labor entering into the subsequent construction of the house thereon.
On the other hand it is equally clear that there was never any actual intent to defraud, on the part of Frederick nor on the part of his agent Florence. Frederick had the fund of $8,500 at and prior to the purchase of the lot. The cost of the house and lot totaled about $7,500, — well within the $8,500 fund, — and of this $7,500, $6,300 was not only paid for out of this $8,500 bank deposit, but was for the most part paid at the very time of the delivery of the materials and immediately upon the performance of the labor. There was no intent or expectation of building the house on credit; it was intended and expected to pay for it as it progressed and without the incurring of debts, and that expectation was carried out until toward the end, when the money was exhausted evidently because of the loss of the $1,200 loan which had been made to the third party, plus the expenditure of some of the moneys for living expenses.
Neither was there any constructive fraud, down to the time that the bank account became exhausted. There is no proof that Frederick owed any debts whatever, at the time of the purchase of the lot. Certainly he was not then indebted to complainants; and it is only existing creditors who have any right to attack conveyances, under the principles and determinations *Page 216 
of Haston v. Castner, supra, and Horton v. Bamford,supra. Neither can complainants, as future creditors, attack the conveyance of the lot under the provision of sections 5 or 6 of the Uniform Fraudulent Conveyance act of 1919, (supra), because the evidence disproves, (or at the very least, fails to prove), that the transferor intended to, — or believed, or had any reason to believe, that he would, — incur debts beyond his ability to pay at maturity, or have an insufficient capital for his building project.
It would seem clear, therefore, that the conveyance of the lot was in nowise a fraud upon these creditors and that no equity thereby arose or exists in favor of them so far as respects the lot (as distinguished from the house); and that the title to the lot vested in the children at that time, free and clear of any lien or encumbrance at law or in equity, and so continued at least to the time of the commencement of the erection of the house.
It does not appear that there are any other unpaid debts than those of the complainants; and it does not appear just when any indebtedness to them first arose, except that it was after the conveyance of the lot. The total price of the materials sold and delivered by the complainant lumber company was about $1,800, of which about $800 remains unpaid; the early deliveries were paid for on delivery. The actual details however do not seem material. All of the materials went into the house and $800 worth of them remain unpaid for. Obviously the time of the voluntary conveyance of these materials to the children was the time when they were incorporated into the house on the land which belonged to the children and obviously the indebtedness for the materials so incorporated arose prior to such incorporation. Hence there can be no question but that by voluntary conveyance (or several such conveyances) $800 worth of materials was transferred to the children and that at the time (or times) of such conveyance (or conveyances) the corresponding indebtedness (or indebtedness) of the transferor therefor had already come into existence. And the same is true as to the materials purchased from the other complainant. *Page 217 
We have a situation which, stated in simpler terms, amounts to this: — Debtor, A, buys $1,200 worth of materials from creditor, B, for which he does not pay; he makes a gift of those materials to a minor child, C, by causing them to be incorporated into a half-finished house on lands owned by donee, C, thereby completing the house; B, unable to obtain payment from A, would have the right to have the materials sold for his benefit, if that could be done without any other injury to C than the loss of these materials for which he had paid nothing; the materials obviously cannot now be taken out of the house without great damage to the house, and, (by common knowledge), having been cut up and used, would be of comparatively little value if theywere removed; there was no actual fraudulent intent by A; there was no knowledge by C that the materials were not paid for, (none is proved, and in any event the donees were all minor children, some of them of tender years). Has B any equitable right in or to the house and/or lot of C? And if so, what?
The desire of equity must needs be toward aiding the creditor if equitably possible; and this not alone under the established theories and principles as to fraudulent conveyance and debtor's property trust fund, already discussed. The equitable principle of vendor's lien is also applicable or pertinent in this instance, — being, as a general principle of natural justice and equity, as applicable to personalty as it is to realty. A vendor's lien on personalty is indeed recognized at law, although at law it is lost by vendor's delivering of possession. Moreover a principle of general public policy in favor of aiding an unpaid material man in the recovery of payment out of the materials sold or out of property or funds which equitably represent or include those materials in another form, is indubitably evidenced by the various mechanics lien, bonding and trust fund statutes such as are mentioned in Leonard D. Sylvester, Inc., v. GiovannoneConstruction Co., 116 N.J. Eq. 515, 174 Atl. Rep. 582, and which are constantly being amended and supplemented to broaden and extend their provisions. And likewise a principle of public policy in favor of aiding a pre-existing creditor *Page 218 
to follow assets into the hands of a donee, notwithstanding such assets have been converted into, or added to and merged with, other property of the donee, and to recover payment therefrom to such extent as may be equitable, is evidenced by the legislation in that behalf in respect to life insurance premiums. See Lanning v. Parker, 84 N.J. Eq. 429, 94 Atl. Rep. 64; Bose
v. Meury, 112 N.J. Eq. 62, at 65; 163 Atl. Rep. 276.
Even at law, if a vendor of personalty has the right to reclaim, such right is not necessarily lost by change of form or by merger or commingling with other goods. See generally, 55C.J. p. 924; 12 C.J. p. 490.
On the other hand, nothing should be done to afford relief to the creditor which will in anywise result in any material damage or injury to the donee, beyond the loss of the materials for which he paid nothing, (or so much thereof as is requisite to satisfy the creditor's unpaid debt), — or something equitably equivalent to the loss of such materials. The donee is perfectly innocent in the matter; there is no ground for any finding of any kind of personal liability against him; and the principle is well established in equity that where one of two persons, both innocent of wrong-doing, must suffer a loss, that loss should fall upon the one through whose fault, act or negligence the loss arose or was made possible.
In the instant case the loss arose from the acts of the two creditors in extending credit to the debtor; in making delivery of the materials to the debtor without obtaining payment or security. The donees had nothing whatever to do with this: they neither participated, nor induced, nor made any representations, active or passive. If the creditors believed that the property belonged to the debtor, that was no fault of the donees, the actual owners: — it was the fault of the creditors who could have learned from the records that the title was not in the debtor.
The debtor wronged the creditors by giving to the donees the materials for which he had not paid and could not thereafter pay. It would be unfair that the donees should keep from the creditors the materials for which they had paid nothing and which had been wrongfully given to them; but *Page 219 
it would also be unfair that they should be placed in any worse position than if they had never received the materials, — and the latter equity is the stronger because the donees were guiltless in the matter whereas the creditors were guilty of some negligence and made the debtor's wrongful act possible.
It does not appear from the proofs just when the creditors' debts arose nor just what was the condition or value of the partly finished house at the time those debts did arise. The burden is on complainants and the presumptions must be most strongly against them. The total price of the lumber material supplied by the complainant Lumber Co. was about $1,800, of which about $1,000 was paid. It must be assumed that the $749 which was not paid was for the lumber supplied latest in point of time. The house must have been considerably more than half finished when the Lumber Co.'s $749 debt arose, — and the same as to the debt of $333 due Reiss Bros. for millwork, — even though (by common knowledge) a considerable amount remained to be supplied in the way of labor and some materials, putting the lumber and millwork into place, painting, and finishing touches.
The house in the condition in which it was at the time these two debts arose, as well as the lot on which it was erected, belonged at that time to the children, entirely free of any claims legal or equitable by complainants or any other creditors. So far as complainants are concerned the partly finished house and lot was just as much the sole property of the children as if it had been given to them (fully paid for) by some outside party, — or as if it had been paid for by the children's own moneys. The debts then arose for the materials from these creditors and the debtor thereafter put these materials and some additional of his assets into that house; but that gave these creditors no equitable claim against the house and lot (or the value thereof) as it stood immediately prior thereto. It did give these creditors some equitable claim against the portion of the housethereafter constructed (or the value of that portion), because that subsequent portion was composed of assets of the debtor given away by him while he was indebted, — partly the very materials *Page 220 
for which he owed the debts and partly moneys which he paid thereafter for labor and other materials in completing the house.
The proofs are not definite, but they justify a finding that the total cost of house and lot was $7,500. Of this the lot cost $1,000, leaving $6,500 as the cost of the house. It seems fair to the defendant children to assume that a minimum of at least $2,000 was put into the house by the debtor after these debts arose, ($1,082 being the materials supplied by complainants and $918 for labor and additional materials to complete the house). Certainly the complainants have not proved any greater amount. This would leave $5,500 as the cost of the lot and partly finished house as of the date the debts arose. It is also fair to assume these cost figures of $5,500 and $7,500 respectively, (there being no other proofs) as being the respective values of the unfinished house and lot and the completed house and lot.
This would tend to indicate that complainants should have an equitable lien (for the amount of their debts) on an undivided part or interest in the property equal to 20/75 of the whole; and it would not seem unfair to permit such undivided interest to be sold for complainants' benefit in this behalf, — subject however to some conditions or restrictions, as hereinafter mentioned. The $5,500 of lot and half-finished house is all that belonged to the children when the debtor committed his equitable wrong against the creditors. The other $2,000 worth of house was given to them by the debtor subject to the equitable lien of the creditors. If the $5,500 worth is preserved to the children, they have no right to object to complainants' taking so much of the $2,000 worth as is necessary to obtain payment of the debts due complainants.
The children are of course entitled to have the $5,500 worth preserved to them. It would obviously not be equitable to give complainants a lien on the whole house and lot. Neither would it be equitable to permit a sale of the whole house and lot, (especially under present economic conditions), in order to permit the creditors to turn the 20/75 *Page 221 
part into cash for the satisfaction of their claims; — without adequate security or guarantee that the children's $5,500 worth would be preserved to them. In Horton v. Bamford, supra, a grantee for inadequate consideration, who knew of the debtor's fraudulent intent, was protected for the amount of consideration he had actually paid, and the creditors were required, as a condition precedent to a sale of the property which had been fraudulently transferred, to give bond to assure the repayment of that amount to that grantee. (See also Federal Reserve Bank,c., v. Slotoroff, supra, at p. 421.) The children in the instant case hold a much stronger position than did that grantee, for they are in nowise chargeable with any participation or notice of any fraud, actual or constructive.
Neither would it be equitable to permit a sale of the undivided 20/75 part, without protection to the children, — since otherwise the purchaser could immediately sue in partition and obtain a sale of the entire premises, to the probable damage of the children. Ahead of the equitable lien of complainants on the undivided 20/75 part, there should be given to the children a prior equitable lien on that same undivided part, to secure them. The undivided fraction on which the equitable lien is given to complainants must be qualified or restricted with a limitation depriving any purchaser or subsequent owner of that fraction of any right to commence partition of the whole premises, except upon giving bond or other security as hereinbefore mentioned, and with the further limitation giving to the children and their successors in interest an equitable lien on that fraction, (superior to the lien given to complainants), to secure them against any deficiency below a sale price of $5,500 for the undivided 55/75 part, on any sale of the premises initiated by them.
At the time the creditors' debts arose, the donees had a lot and partly finished house, worth (we say) $5,500. They were thereafter given $2,000, by the completion of the house, — but the creditors had a prior right to roughly $1,000 of that $2,000. Prior to the giving of the $2,000 the donees could not have occupied the house. Possibly they might have *Page 222 
completed it, so it could be occupied, for less than $2,000, but certainly not for less then $1,000. This they would have had to pay out of their own funds, if they had that much, (for they had no claim on the debtor-donor), or procure by mortgaging the whole premises. Their only other alternative would have been to sell the property in its unfinished state, as otherwise it would soon have deteriorated and much of the value have been lost, by the effect of the elements and the accrual of taxes. If they had so sold, we assume (as against complainants) they would have received $5,500. That is all they would have had except for the debtor-donor's wrongful act, unless they had put $1,000 of their own money or credit into it. In fact they now have a $7,500 house. If they were adults, it would certainly not be inequitable to them to require them to use $1,000 of their own funds, or mortgage the property for that amount, in order to keep the $7,500 house. If they were not infants, they would be able to mortgage the property to raise the $1,000, and to make their own choice as to whether they desired to take that action in order to try to preserve to themselves $6,500 instead of $5,500.
But they are infants, and they have no other assets. They cannot themselves make a choice that they prefer to mortgage the property, to raise and pay the $1,000. And if they could make such choice, they cannot make a valid mortgage. Such a mortgage could be accomplished on their behalf, by a decree of this court giving to complainants a lien equivalent thereto. But this court assuredly would not do so unless it were satisfied that such a course would be for the best interests of the children; and it is equally sure that this court is not and cannot be satisfied that that would be so. The chances are too great that the ultimate result of such a course would be the loss by the children of the entire property.
Considering all the factors involved it would seem that the rights and equities of the children will be preserved by according to complainants an equitable lien, for the amount of their debts, upon an undivided 20/75 part of the premises, with the restrictions and with the prior equitable lien in favor of the children as hereinbefore mentioned, and also according *Page 223 
to complainants the right to have the entire premises sold to raise the moneys due on their equitable lien, provided they give security as hereinbefore mentioned guaranteeing the children against their receiving less than $5,500 for their 55/75 interest in the premises.
No costs to either party.