DOOLEY, J.
¶ 1. This interlocutory appeal presents the question of whether the Sixth Amendment right to assistance of counsel is violated when the plaintiff in a civil wrongful death action attaches funds the defendant *1101 intends to use for her legal defense to homicide charges stemming from the death at issue in the civil case. Defendant appeals a trial court decision permitting such an attachment. We affirm.
¶ 2. The relevant facts are as follows. Defendant is charged with aggravated murder and two counts of murder in the second degree in the deaths of two men. Her trial is pending and a private law firm represents her in that matter. Plaintiff is the estate of one of the deceased men, which pursuant to 14 V.S.A. § 1492 has brought a wrongful death action on behalf of the next of kin. In its filing, plaintiff obtained an attachment freezing defendant's assets, including the retainer she provided for her criminal defense.
¶ 3. In response, defendant filed a motion arguing that a recent U.S. Supreme Court case, Luis v. United States , --- U.S. ----, 136 S.Ct. 1083, 194 L.Ed.2d 256 (2016),[1] held that the Sixth Amendment to the U.S. Constitution prohibited the attachment of untainted funds a defendant wished to use to hire counsel of choice as legal representation in a criminal matter. Plaintiff, unsurprisingly, read Luis differently and argued that the Sixth Amendment prohibited only a prosecutor from attaching untainted funds to be used for criminal legal defense. Following a hearing on defendant's motion, the trial court issued a written decision finding that, though defendant's arguments were persuasive, Luis was inapplicable to the attachment obtained in this suit. The court read Luis for the proposition that "[t]he evil the Sixth Amendment seeks to guard against is a prosecutor civilly seizing a defendant's money to prevent him or her from hiring an attorney. Not the court's issuance of an attachment on funds by any creditor, where the defendant also prefers to use the money to hire a lawyer."
¶ 4. In the same decision, the court granted defendant leave to appeal its interlocutory ruling pursuant to Vermont Rule of Appellate Procedure 5.1, which permits interlocutory appeals when an order "(A) conclusively determines a disputed question; (B) resolves an important issue completely separate from the merits of the action; and (C) will be effectively unreviewable on appeal from a final judgment." V.R.A.P. 5.1(a)(1). This appeal followed.
¶ 5. We review questions of law de novo. Smith v. Desautels , 2008 VT 17, ¶ 8, 183 Vt. 255, 953 A.2d 620. And we begin our consideration of defendant's argument with the facts of Luis . A federal grand jury indicted Sila Luis for conspiring to commit healthcare fraud against the federal government by using the healthcare companies she operated to bill Medicare for services neither medically necessary nor actually provided. The government alleged that the charged fraud resulted in $45 million improperly paid to Luis' companies. Luis , --- U.S. at ----, 136 S.Ct. at 1103 (Kennedy, J., dissenting). By the time Luis was indicted, she had spent much of the fraudulently obtained money. Pursuant to 18 U.S.C. § 1345, the government sought an order prohibiting Luis from dissipating her remaining assets, including $2 million in her possession, so that these assets could be used to pay criminal penalties and restitution after conviction. Id. at ----, 136 S.Ct. at 1087-88 (plurality opinion). 18 U.S.C. § 1345 permits a court *1102 order freezing certain assets of a criminal defendant charged with violating federal healthcare and banking laws, including three types of assets: "(1) property 'obtained as a result of' the crime, (2) property 'traceable' to the crime, and (3) other 'property of equivalent value.' " Id. at ----, 136 S.Ct. at 1087 (quoting 18 U.S.C. § 1345(a)(2) ). The court order sought by the government fell into the third of these categories, freezing property belonging completely to Luis and untainted by the charged crimes. Id. at ----, 136 S.Ct. at 1087. The district court granted the order the government sought, and the U.S. Court of Appeals for the Eleventh Circuit affirmed. Luis petitioned for certiorari, which the U.S. Supreme Court granted.
¶ 6. There is no majority opinion in Luis . Justice Breyer's four-justice plurality opinion adopted the broadly framed question presented in Luis' petition for certiorari: "whether the pretrial restraint of a criminal defendant's legitimate, untainted assets (those not traceable to a criminal offense) needed to retain counsel of choice violates the Fifth and Sixth Amendments." Id. at ----, 136 S.Ct. at 1088 (quotation and alteration omitted). It is clear from the Luis opinion that "pretrial" in that case means prior to the criminal trial. The plurality answered the Sixth Amendment question in the affirmative, as did Justice Thomas' concurrence. Id. at ----, 136 S.Ct. at 1096 ; ids="12594905,12594906" index="19" url="https://cite.case.law/s-ct/136/1083/">id. at ----, 136 S.Ct. at 1097 (Thomas, J., concurring). Although the question presented was expansively framed, the Court's analysis was narrowly focused.
¶ 7. That analysis began with the Sixth Amendment, which guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. This right is echoed in our state constitution, which provides that "in all prosecutions for criminal offenses, a person hath a right to be heard ... by counsel."[2] Vt. Const. ch. I, art. 10. The right to assistance of counsel is "fundamental," but it is also limited: " '[T]he Sixth Amendment guarantees a defendant the right to be represented by an otherwise qualified attorney whom that defendant can afford to hire.' " Luis , --- U.S. at ----, 136 S.Ct. at 1089 (plurality opinion) (quoting Caplin & Drysdale, Chartered v. United States , 491 U.S. 617, 624, 109 S.Ct. 2646, 105 L.Ed.2d 528 (1989) ). A defendant has no right "to an attorney who is not a member of the bar, or who has a conflict of interest due to a relationship with an opposing party," nor does a defendant unable to afford counsel have a right "to have the [g]overnment pay for his preferred representational choice." Id. at ----, 136 S.Ct. at 1089.
¶ 8. The plurality's conclusion that the Sixth Amendment bars the freezing of untainted funds under the facts of Luis turns on a primary point, a point which also supports our conclusion that Luis does not control here. In Luis , the government was exercising a statutory right to forfeiture connected to a criminal prosecution, and the freezing of assets was done to ensure that property to be frozen was available for forfeiture at the end of the criminal case if the government secured a conviction. That right turns on an elementary tenet of property law. Id. at ----, 136 S.Ct. at 1090. The government is statutorily authorized to take by forfeiture property tainted by its connection with a property-based crime because the possessor *1103 has an imperfect ownership interest: "The robber's loot belongs to the victim, not to the defendant." Id. at ----, 136 S.Ct. at 1090. A criminal never has perfect possession of property obtained through criminal activity; a forfeiture action is authorized because the ownership interest of the party seeking forfeiture relates back to the time of theft. But property obtained through legitimate, noncriminal means remains the sole property of the owner, whether that owner has obtained other property through criminal activity or not. Id. at ----, 136 S.Ct. at 1090. The Luis plurality thus drew a sharp line between the government's seizure of "tainted" and "untainted" property. Within the context of the statute at play in Luis , as the victim of Luis' alleged crime, the government retained ownership of and could seize allegedly fraudulently obtained property. The government's right to seize property that Luis obtained through legitimate means was different, and created solely by statute, because the government has no exercisable interest in that property.
¶ 9. The plurality drew support for its conclusion from precedent, common law, and policy. As to precedent, two prior decisions lay the foundation for the Luis plurality decision. One of those is especially relevant here. In Caplin & Drysdale , the client of the appellant law firm was charged with multiple counts of drug distribution. 491 U.S. at 619-20, 109 S.Ct. 2646. Exercising a right similar to the statutory forfeiture right in Luis , the government sought, and received, court-ordered temporary forfeiture of assets in the client's possession and obtained through the crimes charged. Prior to the government's seizure, the client retained the law firm to represent him in the associated criminal matter and placed a deposit in escrow for the firm. He then entered a plea agreement with the government and agreed to forfeit all of the seized assets. The law firm sought to retain the deposit money against the forfeiture, a result the Court denied, holding: "A defendant has no Sixth Amendment right to spend another person's money for services rendered by an attorney, even if those funds are the only way that that defendant will be able to retain the attorney of his choice." Id. at 626, 109 S.Ct. 2646 ; see also United States v. Monsanto , 491 U.S. 600, 614, 109 S.Ct. 2657, 105 L.Ed.2d 512 (1989) (holding Sixth Amendment does not "permit a defendant to use assets adjudged to be forfeitable to pay that defendant's legal fees").
¶ 10. Caplin & Drysdale stands for the proposition that a statutorily authorized forfeiture of money held for legal representation in the underlying criminal case is permitted because it is the exercise of a legitimate property interest. As explained by Luis , no Sixth Amendment conflict is created because the funds taken illegally from the government were, and are, the government's property irrespective of the criminal's possession of them.
¶ 11. Turning to consideration of the common law, the plurality quoted and cited Blackstone for the eighteenth-century rule that a person may freely sell his property before conviction and it is only post-conviction that the government has any right to seize the convict's "goods and chattels." Luis , --- U.S. at ----, 136 S.Ct. at 1094 (plurality opinion). Thus, any forfeiture remedy that gave the government a right of forfeiture in property owned by the criminal defendant-"untainted" property as the Court labeled it-was a modern construct that was subject to the Sixth Amendment. Id. at ----, 136 S.Ct. at 1088.
¶ 12. This conclusion alone was sufficient for Justice Thomas, who concurred on that basis. Id. at ----, 136 S.Ct. at 1099 (Thomas, J., concurring). The concurrence also *1104 notes that the Sixth Amendment effectively denounced the British rule denying counsel to felony defendants. Id. at ----, 136 S.Ct. at 1097. And since the amendment's guarantee is no "flimsy parchment barrier," it necessarily must include the prerequisites to its own fulfillment. Id. at ----, 136 S.Ct. at 1098 (quotation and alteration omitted). The right to counsel includes, therefore, "constitutional protection for at least some of a defendant's assets." Id. at ----, 136 S.Ct. at 1098. If it were otherwise, the government could preempt a defendant's right to counsel of choice by statutory authorization of forfeiture in all cases. Id. at ----, 136 S.Ct. at 1098 ; see also ids="12594905,12594906" index="53" url="https://cite.case.law/s-ct/136/1083/">id. at ----, 136 S.Ct. at 1094 (plurality opinion) (explaining that Congress could authorize pretrial asset restraint in other cases, "unleash[ing] a principle of constitutional law that would have no obvious stopping place").
¶ 13. Finally, the plurality reasoned that permitting seizure of untainted assets would "render less effective the basic right the Sixth Amendment seeks to protect" by increasing public defender caseloads because defendants otherwise able to pay for private representation would be rendered indigent through forfeiture. Id. at ----, 136 S.Ct. at 1095 (plurality opinion). On this point, Justice Kennedy in dissent responded: "Given the large volume of defendants in the criminal justice system who rely on public representation, it would be troubling to suggest that a defendant who might be represented by a public defender will receive inadequate representation." Id. at ----, 136 S.Ct. at 1110 (Kennedy, J., dissenting).
¶ 14. The plurality ultimately placed the considerations discussed above in a balancing test, balancing the Sixth Amendment right of the criminal defendant against the government's right to forfeiture to recoup the criminal penalty and its losses. Id. at ----, 136 S.Ct. at 1093 (plurality opinion). It found that the Sixth Amendment right had greater weight with respect to "untainted" assets because in many cases the government would have tainted assets from which the government could obtain the criminal penalty and restitution, the common law did not allow for a pretrial forfeiture remedy, there is no stopping point for a government right to pretrial forfeiture remedies, and pretrial freezing of untainted property would force more cases into the underfunded public defender systems. See ids="12594905,12594906" index="61" url="https://cite.case.law/s-ct/136/1083/">id. at ----, 136 S.Ct. at 1093-96.
¶ 15. With the rationale of the plurality and concurrence in Luis in mind, we turn to whether the Sixth Amendment is violated by the attachment order in this case. In support of her position, defendant argues that the circumstances that created the Sixth Amendment violation the U.S. Supreme Court found were present in Luis are also present here. The court order in this case results in a freezing of defendant's funds designated for defense of the criminal case, and the funds are entirely "untainted"-that is, they are not fruits of the alleged criminal case.
¶ 16. It is important to recognize that this is neither a forfeiture case nor a criminal case. Nothing in the Luis plurality or concurrence suggests a holding applicable outside the context of remedies created by a criminal proceeding and the ultimate conviction, particularly asset forfeiture and its unique reliance on property interests.[3]
*1105 Thus, there are significant differences between the context, facts, and law in this case and those in Luis , and these are unexplored in any of the Luis opinions. Our conclusion is that the differences lead to a different result.
¶ 17. In Luis , the United States was both the prosecutor of the criminal case and the victim of the alleged crime. The security procedure employed was an adjunct to the criminal proceeding and could result in forfeiture only if the defendant was convicted. The Court described it as follows:
The [g]overnment here seeks a somewhat analogous order, i.e. , an order that will preserve Luis' untainted assets so that they will be available to cover the costs of forfeiture and restitution if she is convicted , and if the court later determines that her tainted assets are insufficient or otherwise unavailable.
Id. at ----, 136 S.Ct. at 1093 (emphasis added). If we could put the holding of Luis into one sentence, it would read: The Sixth Amendment bars a prosecutor from depriving a defendant of the ability to hire a lawyer of the defendant's choice through forfeiture of funds necessary to hire that lawyer and derived from sources unconnected to the alleged crime.
¶ 18. Here, although this action may arise out of a core of facts in common with the criminal case, there is no connection between the criminal proceeding and this private tort action. The State is not a party in this action and is not seeking any relief here. The plaintiff is using a temporary and pretrial security device that is generally available in any civil damage suit if plaintiff can show need and probability of success in the litigation. Plaintiff is in the position of a creditor ensuring that it will be able to collect on a civil money judgment.
¶ 19. Unlike the common law background of forfeiture in criminal cases, where preconviction restraint of property subject to forfeiture was not allowed, we are dealing here with a pretrial security procedure, the use of which stretches back into the English law before the founding of the United States.[4] The specific device used here, trustee process, was authorized by Vermont statute in 1797. See Laws of Vermont, ch. LV, at 499 (Oct. 31, 1797). It is a form of attachment that was recognized by statute earlier that same year. See Laws of Vermont, ch. III, § 26, at 84-86 (March 2, 1797). Apparently because of its common law origins, this form of attachment appears in our case law even before the 1793 constitution that followed Vermont's entry as a state and under which the above statutes were adopted. See Conant v. Bicknell , 1 D.Chip. 50 (Vt. 1790) ; J. Beale, The Exercise of Jurisdiction in Rem to Compel Payment of a Debt , 27 Harv. L. Rev. 107, 112 (1913) (explaining that attachment law originally part of the Custom of London of Foreign Attachment became part of common law in some colonial jurisdictions). Further, before Vermont's statehood, the trustee process was claimed by New York, and New York courts ran in Vermont. Under the Duke of York's Laws of 1665-75, attachment was *1106 available in New York courts. See The Duke of York's Laws, 1665-75, in The Colonial Laws of New York from the Year 1664 to the Revolution Vol. I 15 (1894). To the extent that Luis turns on the common law of forfeiture, the common law of attachment suggests a different outcome.
¶ 20. A criminal defendant's ability to hire a lawyer of choice to defend a criminal proceeding depends, as this case demonstrates, on having the funds necessary to pay a lawyer. There are many reasons why such funds may be unavailable including that the defendant is in debt, for example, for necessities that cannot be ignored. In essence, defendant's position is that private creditors are required to bear the criminal defense costs of debtors who are criminal defendants because the debtor has a right to counsel in the criminal proceeding. That right is against the state and not private creditors.
¶ 21. Defendant suggests that the right being enforced in this civil proceeding exists because it is related to the criminal proceeding for which defendant needs to protect the ability to fund defense costs. That rationale is perverse. In essence, it requires that victims, uniquely, subsidize the criminal defense costs of the accused by foregoing the ability to collect some of their civil damages from the accused. We see no justification for treating plaintiff any differently than any other creditor in civil damage litigation, and the effect would be to add another exemption from execution and levy to the many already provided by Vermont law.[5] See generally 12 V.S.A. § 2740.
¶ 22. The plurality in Luis ultimately decided that case by balancing the defendant's Sixth Amendment right against the government's right to obtain property to pay itself back for loss caused by the defendant's crime. We need not reach a balancing test to decide this case. If we did, we would conclude that the result of balancing in this context is different than in Luis . As we stated above, the common law basis for plaintiff's action is different and includes a stronger interest for plaintiff here. Moreover, plaintiff's pretrial remedy has a clear bright-line stopping point largely because defendant's due process rights are not reduced simply because she is a criminal defendant. See Connecticut v. Doehr , 501 U.S. 1, 18, 111 S.Ct. 2105, 115 L.Ed.2d 1 (1991) (explaining that statute permitting prejudgment attachment without showing exigent circumstances violates due process). While we acknowledge the scope of the Sixth Amendment right to provide defendant a lawyer of her choice, if she can fund such a choice, we cannot conclude that our decision in this case will have a significant effect on the caseloads of public defenders or impair the quality of representation defendant or others would receive. As we discussed above, we see no justification for the victim to subsidize the legal costs of defendant in defending her criminal case.[6]
Affirmed .

This decision includes a plurality opinion written by Justice Breyer and joined by Chief Justice Roberts and Justices Ginsburg and Sotomayor; a concurring opinion written by Justice Thomas; a dissent written by Justice Kennedy and joined by Justice Alito; and a dissent written by Justice Kagan. The opinions written by Justices Breyer, Thomas, and Kennedy are discussed infra .

Though our state constitution includes a right to the assistance of counsel, neither party has argued that this right precludes the attachment at issue here. Thus, we do not consider whether the state constitution could bar the action plaintiff seeks. We confine our analysis to the federal constitution and the Luis decision that defendant argues controls.

We note that to date the cases applying the Luis holding have read this decision to bar seizure of untainted assets within the context of a federal forfeiture statute. See, e.g., United States v. Jones , 844 F.3d 636 (7th Cir. 2016) ; United States v. Lindell , 2016 WL 4707976 (D. Hawaii Sept. 8, 2016) ; United States v. Johnson , 2016 WL 4087351 (D. Utah July 28, 2016) ; United States v. Marshall , 2016 WL 3937514 (N.D.W. Va. July 18, 2016). We have found no cases in which a court has applied Luis beyond this narrow context.

The origin of prejudgment attachment and trustee process laws in the United States starts with the Custom of London of Foreign Attachment, which arose in the 17th century. See C. Drake, A Treatise on the Law of Suits by Attachment in the United States Ch. I, § 1, at 1 (7th ed. 1891); R. Wasserman, Equity Renewed: Preliminary Injunctions to Secure Potential Money Judgments , 67 Wash. L. Rev. 257, 271-75 (1992).

We note that three states have by statute exempted attorney's fees paid in defense of a criminal case from forfeiture in connection with that case, essentially implementing, at least in part, the holding of Luis . See 725 Ill. Comp. Stat. 5/124B-145 (2016); Mich. Comp. Laws § 750.159m(6) (2016) ; N.Y. C.P.L.R. 1312(4) (Consol. 2016). In each state the exemption applies only in a forfeiture proceeding related to a criminal proceeding. In none of these states did the legislature exempt funds used or to be used for defense of a criminal case from levy and execution generally. See 725 Ill. Comp. Stat. 5/12-1001 (itemizing list of exemptions from levy and execution); Mich. Comp. Laws § 600.623 (same); N.Y. C.P.L.R. § 5205 (same).

We acknowledge that plaintiff has raised several other arguments on appeal that are claimed to support the attachment sought. The interlocutory order we review here addressed the sole question of whether Luis applied. Thus, we do not address plaintiff's other arguments.