NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3450-19T1
 A-3452-19T1

B.B.,

     Plaintiff-Appellant,

v.

S. BRADLEY MELL, KIMBERLY
RUGGLES MELL, W.H. MELL
ASSOCIATES, INC.,
GULFSTREAM CM, LLC,
GULFSTREAM GM, LLC, and
AERO CARE SERVICES, LLC,

     Defendants,

_____

LOMURRO, MUNSON, COMER,
BROWN & SCHOTTLAND, LLC,

     Respondent.

_____

| APPROVED FOR PUBLICATION |
| :---: |
| **November 23, 2020** |
| **APPELLATE DIVISION** |

       Argued November 10, 2020 – Decided November 23, 2020

       Before Judges Fisher, Gilson and Moynihan.

       On appeal from the interlocutory orders of the Superior
       Court of New Jersey, Law Division, Essex County,
       Docket No. L-7200-19.

       Bruce H. Nagel argued the cause for appellant (Nagel
       Rice, LLP, attorneys; Bruce H. Nagel, of counsel and

on the brief; Diane E. Sammons, and Michael J. Paragano, on the brief).

Christina Vassiliou Harvey argued the cause for respondent (Lomurro, Munson, Comer, Brown & Schottland, LLC, attorneys; Richard Lomurro, of counsel and on the brief; Nicholas Pantages, and Angel Falcon, on the brief).

The opinion of the court was delivered by

FISHER, P.J.A.D.

In this interlocutory appeal, we consider whether or to what extent defense counsel in a civil action is entitled to be paid from funds that were the subject of a prejudgment attachment. Concluding that the statutes and rules governing attachments and equitable principles do not support the payment of fees from the attached funds, we reverse the orders under review.

In putting this issue in perspective, we note that there is no dispute that, over the course of five months from July to December 2017, defendant S. Bradley Mell engaged in sexual relations with plaintiff B.B., who was then fifteen-years old. That illicit and unlawful relationship was eventually discovered and led to Mell's arrest in May 2018; a year later, Mell pleaded guilty

to state and federal crimes[1] arising from his victimization of B.B., and he is presently serving a seven-year federal prison term in Pennsylvania.

B.B. commenced this civil action for damages in October 2019 and quickly sought a prejudgment writ of attachment of Mell's assets. After receiving opposition and considering counsel's argument, the judge entered an order on January 3, 2020, that denied an attachment of Mell's property but directed the payment of forty percent of funds due Mell from defendants Gulfstream CM, L.L.C., and Gulfstream GP, L.L.C. (collectively, Gulfstream) into an account held by Tompkins, McGuire, Wachenfeld & Barry, Gulfstream's attorneys. After a dispute about the order's scope, the judge entered another four days later, this time granting B.B.'s application for a writ of attachment "against any and all of Bradley Mell's assets and income including but not limited" to the buyout, future retirement distributions, and other money due him from Gulfstream and defendant Aero Care Services, L.L.C., including from the sale of Mell's jet. This January 7, 2020 order further directed Mell to "account for any and all" funds he had either received or would receive from W.H. Mell

---

[1] Mell pleaded guilty in the state matter to endangering the welfare of a child, N.J.S.A. 2C:24-4(a)(1), and in the federal matter to receipt of child pornography, 18 U.S.C. § 225A(a)(2), and travel with the intent to engage in illicit sexual conduct, 18 U.S.C. §2423(b).

Associates, Gulfstream, and Aero Care, and all amounts received through the sale of any other property. He was also ordered to account for and pay into the Tompkins account any and all asset transfers made by him in his individual capacity or as a trustee over "the last three years." The order lastly enjoined and restrained Mell from any other transfers, encumbrances or hypothecation of any assets held in his individual or trustee capacity.[2]

This prompted another dispute, resulting in an order entered on January 23, 2020, that vacated the January 3 and 7, 2020 orders but that was otherwise identical to the January 7, 2020 order except: the income from Gulfstream was directed to be paid into the trust account of B.B.'s attorneys; and the proceeds of the sale of property or any other asset transfer made by Mell as a trustee were not to be deposited into any trust account.

Soon after, Mell successfully moved for a modification of the existing restraints to permit the payment of his legal fees to Lomurro, Munson, Comer, Brown & Schottland (Lomurro), his attorneys in this civil action. The judge's March 16, 2020 order invited Mell's submission of a proposed order that would modify the January 23, 2020 attachment order, as well as an itemization of

---

[2] Mell and his ex-wife later moved for reconsideration of this last provision, prompting the judge to enter an order on March 16, 2020, that modified the language of the injunction in a way not presently relevant.

Lomurro's "fair and reasonable legal fees."  Following Mell's submission to the trial judge, B.B. filed opposition, sought a stay, and soon moved in this court for leave to appeal the March 16, 2020 order.  On April 9, 2020, the judge entered an order compelling the payment of $26,026.50 to Lomurro from B.B.'s attorney's trust account.[3]  On April 13, 2020, the judge granted a stay of the April 9, 2020 order pending our disposition of B.B.'s motion for leave to appeal the March 16, 2020 order.  B.B. then moved for leave to appeal the April 9, 2020 trial court order.

On May 7, 2020, we granted both motions for leave to appeal, stayed both orders under review, consolidated the two interlocutory appeals, and imposed an accelerated briefing schedule.

In appealing, B.B. argues that the trial judge erred in:  (1) "allowing [Mell], an admitted sexual abuser, and his attorney[,] priority over a victim" as to the property attached; (2) allowing relitigation of the attachment order; (3) rushing to the fee determination without discovery; (4) failing to properly analyze the fee applications in the manner required by Rendine v. Pantzer, 141 N.J. 292 (1995); and (5) determining the trial court was the proper forum for

_____

[3]  Around this time, Lomurro sought to be relieved as Mell's counsel.  That motion was granted on May 21, 2020.

fixing the amount of fees sought by Lomurro. Because we agree with B.B.'s first argument, we reverse both orders under review without reaching the other four arguments.

To explain, we need only briefly review the significance of the attachment, the absence of any counsel-fee exception to an attachment, and the overpowering equities that favor rejection of the claim of Mell and his former attorney to the payment of fees from the attached funds.

To start, prejudgment attachment is an extraordinary remedy. Russell v. Fred G. Pohl Co., 7 N.J. 32, 39 (1951). An attachment is also a legislative creature and its availability is "not to be enlarged beyond the plain meaning and understanding of its terms." Id. at 41. B.B. convinced the trial court that she was entitled to this extraordinary remedy, and the January 2020 orders that granted this relief are not in question in these appeals. So, we proceed with our analysis of the issues with that understanding.

In this State, as a general matter, the creditor "who levies first" has priority "over all nonlevying judgment creditors," New Brunswick Savings Bank v. Markouski, 123 N.J. 402, 413 (1991), let alone all unsecured creditors. By obtaining a writ of attachment, a creditor or claimant also takes priority over creditors that later levy, unsecured creditors, and claimants that join in the

attachment proceeding as permitted by <u>Rule</u> 4:60-15(e),[4] even before the party obtaining the writ has yet to obtain a judgment against the defendant. <u>See</u> <u>Pulaski Sav. & Loan Ass'n v. Aguiar</u>, 174 N.J. Super. 42, 49 (Ch. Div. 1982). As explained in plain language by one commentator, a plaintiff in a pending tort action – when compared to other creditors – is "the low person on the totem pole," but that plaintiff's place rises on the pole above other unsecured creditors and claimants, and others who later levy, on obtaining a prejudgment attachment. Rhonda Wasserman, <u>Equity Renewed: Preliminary Injunctions to Secure Potential Money Judgments</u>, 67 <u>Wash. L. Rev.</u> 257, 283-84 (1992); <u>see also</u> <u>Wolfson v. Bonello</u>, 270 N.J. Super. 274, 287 (App. Div. 1994). So, as a general matter, by obtaining an attachment in this action in January 2020, B.B.'s as-yet undetermined unliquidated claim for damages gained priority over any unsecured creditors, like Lomurro.

But this position on the creditor-claimant totem pole is not permanently fixed. While N.J.S.A. 2A:26-8 declares that a prejudgment attachment "shall

---

[4] The rules applicable to such an action allow for the assertion of claims by persons having liquidated or unliquidated claims against the defendant, <u>R.</u> 4:60-15(a), while also recognizing that these later-appearing claimants "shall participate, in proportion to but not in excess of their respective judgments against the defendant . . . <u>after</u> the payment of costs and charges directed by court order to be paid therefrom and <u>after</u> payment of the plaintiff's judgment and costs, if any," <u>R.</u> 4:60-15(e) (emphasis added).

bind the attached goods and chattels, rights and credits, moneys and effects of defendant attached from the time of its execution" until entry of judgment, it also recognizes that this secure position remains fixed to the attached property "unless" property is "released . . . during the pendency of the action." This language can only mean that a court retains the authority to release property from the reach of the attachment in appropriate circumstances not otherwise identified in the statutory scheme. Although it is not clear whether this statutory authorization was part of the trial judge's thinking when entering the orders under review – the judge cited no authorities and based his rulings solely on his "belie[f] that everyone should get paid" and that Lomurro "is certainly entitled to eat" – the effect of his ruling was to "release" $26,026.50 from the attached funds for the benefit of Mell and Lomurro.[5]

---

[5] We digress to note that the record contains numerous references to Mell's great wealth. It is also alleged that, prior to his incarceration, Mell engaged in a number of steps to insulate his assets, steps that included the sale of a jet and the marital home in Bedminster that alone were valued at over $6,000,000; it is not clear to us what, if anything, has happened to his home on Nantucket. At the same time – allegedly in an apparent attempt to avoid liability to B.B. – Mell allegedly told B.B. that he had placed $500,000 in an escrow account for her benefit. He also allegedly advised her that he had dissipated $483,000 of that fund, and that he had arranged to allocate other income or assets into trusts for his children, making them "crazy wealthy." At oral argument, we were informed that the funds held in trust through the January 23, 2020 attachment order, which came from payments owed Mell by Gulfstream, amount now to the relatively

Even though not otherwise explained by the judge, we are required to consider whether there was a legal or equitable basis to "release" that part of the attached funds for Mell and Lomurro's benefit. Neither the statutory attachment provisions nor our case law defines what a court should consider when determining whether to "release" funds that have already been attached. In one case – decided prior to the enactment of the current attachment statutes – the right to a release of attached funds was found when another party possessed a clear and prior right to the attached property. See Russell, 7 N.J. at 41-42 (recognizing the greater interest existing in a party who had been validly assigned the property by the debtor prior to the attachment). So guided, we conclude that N.J.S.A. 2A:26-8 provides a court with the authority, in an appropriate circumstance, to protect a previously-arising, more equitable claim than that possessed by the party obtaining the writ of attachment. No such right was established by Mell or Lomurro here. Far from it.

The fees in question were incurred during these proceedings, long after the tortious conduct that prompted B.B.'s suit and pursuit of a writ of attachment.

---

small approximate amount of $238,000. The judge's order had the disturbing consequence of releasing nearly ten percent of what B.B. had been able to locate and secure by the time these appeals were filed with the possibility that, if left unchecked, additional portions of the attached funds might also be used by Mell, who is presently self-represented, to retain new counsel.

Mell and Lomurro clearly have no greater or prior equitable right that would entitle them to a "release" of approximately ten percent of the attached funds in the proceedings in which they energetically sought to avoid the creation of that very fund. In fact, we see no equities at all that favor the payment of these fees from the fund. What could be more inequitable than to allow Mell to have his debt to Lomurro paid from the funds attached for the benefit of the victim of his crimes? We are reminded of the old equitable maxim that "a man must be just before he is generous." In re Estate of Passoff, 359 N.J. Super. 112, 118 (Ch. Div. 2002) (quoting Horton v. Bamford, 79 N.J. Eq. 356, 381-82 (Ch. 1911)); see also Sweney v. Carroll, 118 N.J. Eq. 208, 215 (Ch. 1935). Mell has an obligation – as yet unquantified – to B.B.; the argument that Mell should be entitled to pay his expenses, such as counsel fees, in resisting that obligation should fall on deaf ears. Mell cannot be generous with his funds – particularly when they have been lawfully attached – by honoring other debts, when he has yet to be "just" to B.B.

Lomurro lastly argues in this appeal that the orders under review may be sustained because, in these proceedings, Mell has a right to counsel which the attachment would otherwise unduly or inequitably hamper. On this point, Lomurro chiefly relies on Rule 4:60-10(c). That reliance is misplaced.

10

The attachment rules generally outline in detail the procedures to be followed in actions in which a writ of attachment is sought. Rule 4:60-10, to which Lomurro refers, in large measure presupposes circumstances in which the writ of attachment has issued ex parte or when the defendant has yet to appear, neither of which circumstance occurred here. Specifically, Lomurro relies on subsection (c) of that rule; that subsection, however, states only that "[a] defendant who appears in the action and defends the same may move against the attachment or levy at any time before final judgment[.]" R. 4:60-10(c). Lomurro argues that this subsection somehow guarantees a defendant in such an action not only a right to counsel but the right to have counsel fees paid from attached funds as well, when the subsection mentions neither "counsel" nor "fees."

Nothing expressed in the attachment statutes, N.J.S.A. 2A:26-1 to -16, or the attachment rules, R. 4:60-1 to -19, gives this defendant any greater rights than would be possessed by any other civil litigant. And these authorities do not implicitly suggest that the defendant whose funds were validly attached has a right to have counsel fees paid from the attached funds absent some compelling equitable claim.

To be sure, the applicable statutes allow for exceptions from attachment. See, e.g., N.J.S.A. 2A:26-4 (declaring exempt from attachment "[h]ousehold

goods and furniture not exceeding $1,000.00 in value"); N.J.S.A. 2A:26-5 (recognizing that the attachment exempts, in some circumstances, "[w]ages or other compensation for labor or services," as well as a nonresident's "personal property in this state" when the claim was asserted by "a nonresident creditor" when "such property is exempt from liability by the law of the state of which the debtor and creditor are residents"). Another exception arises in the limited circumstance recognized by the Supreme Court of the United States in Luis v. United States, 136 S. Ct. 1083 (2016). There, the divided Court[6] narrowly found a Sixth Amendment deprivation when the government brings an attachment action against a criminal defendant to freeze untainted funds[7] as the means of ensuring payment of restitution expected to be ordered once the defendant is convicted. That circumstance is not present in this case. Mell was prosecuted

---

[6] Justice Breyer wrote an opinion so holding that was joined by the Chief Justice and Justices Ginsburg and Sotomayor. Justice Thomas concurred in the judgment for different reasons. Justice Kennedy filed a dissenting opinion that was joined by Justice Alito. Judge Kagan filed a separate dissenting opinion.

[7] The Court found no such limitation when a government seeks forfeiture of property tainted by its connection with the defendant's alleged crimes. Id. at 1089-90; see also Caplin & Drysdale, Chartered v. United States, 491 U.S. 617, 626 (1989) (holding that the criminally accused "has no Sixth Amendment right to spend another person's money for services rendered by an attorney, even if those funds are the only way that that defendant will be able to retain the attorney of . . . choice").

and convicted before this action was even commenced. No Sixth Amendment interest attached here.

There is also no reason to believe that the Supreme Court's concerns in Luis are applicable when it is not the government but the victim of the crime that seeks a writ of attachment that might interfere with the criminal defendant's ability to retain counsel. In construing the reach of the Supreme Court's majority opinion, Vermont's highest court held that Luis was limited to finding a constitutional infringement on pre-prosecution attachment when sought and obtained by the government, not a private party. Estate of Lott v. O'Neill, 165 A.3d 1099, 1105-06 (Vt. 2017). The Vermont court concluded it would be "perverse" if crime victims were required to "subsidize the criminal defense costs of the accused" by being compelled to forgo the ability to collect some of their damages from the accused. Id. at 1106.

We not only embrace this sentiment, but our holding is further buttressed by the fact that the circumstances are far different from Lott, where the defendant had not been convicted by the time of the attachment. Id. at 1101. Mell has been convicted and presently sits in a federal penitentiary for having victimized B.B. Concerns about his ability to defend himself in the criminal prosecutions are simply not present here. In short, we find nothing about the

A-3450-19T1

Court's holding in <u>Luis</u> that would suggest some limitation on the reach of an attachment when the attachment was obtained by the crime victim against the assets of the perpetrator whether commenced before, during or after the criminal prosecution.

We lastly find it inequitable to allow Mell access or use of attached funds when there remains a dispute about whether he has identified all his assets and whether he has other assets that have yet to be attached. B.B. argues that she has been stonewalled in seeking discovery about Mell's assets and his transfer of assets.[8] Until Mell makes a full disclosure, there is no reason to conclude he lacks other assets available to pay his attorneys and no reason to allow – or even consider – an invasion of the attached funds for that purpose.

And, so, we decline the invitation to find for Mell a legal or equitable right to the payment of his counsel fees – incurred in a civil action brought by his victim – from funds that have been attached for his victim's benefit. In reversing, we conclude that B.B. has a higher priority to the attached funds than Mell or Lomurro, that nothing in the statutes or rules governing attachment actions creates an exception from attachment for a defendant's counsel fees, and

---

[8] At oral argument, we invited additional submissions about other parts of the trial court record and learned that in April 2020, Mell's responsive pleading was stricken for failure to provide discovery.

that neither Mell nor Lomurro has demonstrated an equitable right to the attached funds greater than B.B.'s right to the security provided by the attachment.

The March 16 and April 9, 2020 trial court orders are reversed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3450-19T1